DEBORAH M. SMITH
Acting United States Attorney

STEVEN E. SKROCKI
JAMES BARKELEY
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov
          james.barkeley@usdoj.gov

Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:06-cr-022-JWS |
| | ) | |
| Plaintiff, | ) | UNITED STATES' |
| | ) | OPPOSITION TO |
| vs. | ) | DEFENDANT SECURITY |
| | ) | AVIATION, INC.'S MOTION |
| ROBERT F. KANE, | ) | TO COMPEL DISCOVERY |
| a/k/a "COMMANDER KANE," and | ) | |
| SECURITY AVIATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the United States, by and through counsel, and hereby opposes Defendant Security Aviation, Inc.'s Motion to Compel Discovery.

A.  **BACKGROUND**

    1.    **The Universe of Documents And Other Evidence Seized Pursuant to Search Warrants on February 2, 2006**

Under the "Background" section of its Motion, Defendant Security Aviation, Inc. ("SAI") correctly notes that on February 2, 2006, federal search warrants were executed at SAI's South Airpark Drive offices at the Ted Stevens Anchorage International Airport, at its hangar in Palmer, and at the offices of Avery & Associates, Regional Protective Services, and related companies in Anchorage. A federal search warrant was also executed that same day at the Eagle River residence of codefendant, Robert F. Kane. A vehicle belonging to Mr. Kane, situated on the residence premises, was also searched that day.

Pursuant to those search warrants, approximately 140 large envelopes and 4 banker's boxes of documents were seized from the South Airpark facility. 11 banker's boxes and 23 envelopes were seized from the Palmer hangar. 140 envelopes and 40 banker's boxes of documents were seized from the "C" Street location, and 36 envelopes and 2 banker's boxes of documents were seized from the Magnaview Drive residence and vehicle of Defendant Kane in Eagle River. As of March 30, 2006, approximately 17,000 pages of these documents have been scanned and produced to the Defendants. An estimated additional 75,000 pages of

seized documents remain to be scanned and produced in a comprehensive, searchable database format.

In addition, 9 computers were seized from the Magnaview residence and the Kane vehicle; the contents have been imaged and the computers have been returned to counsel for Defendant Kane. Exh. 5. Similarly, 4 computers and other storage devices were seized from the "C" Street location; they, too, have been imaged and returned to counsel for SAI. Exh. 6.

## B. SAI's OUTSTANDING DISCOVERY REQUESTS

The United States hereby addresses each of the discovery requests which SAI is using as the basis of its Motion to Compel Discovery (pp. 2-3, SAI's Memorandum in Support of Motion to Compel Discovery):

1. **"Documents seized from the premises of Security Aviation and its affiliated company RPS."**

As to these documents, the United States is in full compliance with its discovery obligations, under Rule 16 and otherwise. While it is true that documents "obtained from" or "belonging to the defendant" (Rule 16(E)(iii)) must be produced upon request, discoverable documents must still somehow constitute relevant evidence under Federal Rule of Evidence 401. The vast majority of documents seized pursuant to the above-referenced search warrants - perhaps as much as 90% or more of the seized documents - are not relevant to the charges framed by the Indictment. Instead, they were duly seized for investigative purposes pursuant to the search warrants. At this time, the United States has made every effort to aggressively review the documents, locate documents which are relevant to the charges in the Indictment, and specifically provide them to the

defense, outside and in advance of the ongoing comprehensive production of all the seized documents.

The government recognizes that even though most of the seized documents do not pertain directly to the charges in the Indictment, they are records of importance and utility to SAI. Therefore, from the outset, the United States has informed counsel of its intention to scan all of the documents into a searchable database and provide them to the defense, with the highest priority for scanning being given to documents seized from Mr. Kane's Eagle River residence, since he was an individual Defendant, and particularly since he was at that time in custody. All documents seized from Defendant Kane's residence and Defendant Kane's vehicle have been scanned into a searchable database and have been produced to all defense counsel. It should be noted that there was no objection to the government affording production priority to the Kane materials; counsel simply objected that it was taking too long to scan and produce the materials seized from the "C" Street, Airpark Drive and Palmer hangar locations.

The United States has now completed the scanning of all documents seized from the Airpark Drive location, and they will be produced to the defense on March 31, 2006. Together, the scanned documents, already produced, from the Kane residence, Kane's vehicle and the Airpark Drive location constitute approximately 17,000 pages of material. The documents themselves remain available for inspection and copying pursuant to agreement of the parties. Exh. 1. Furthermore, the United States voluntarily culled e-mails and other documents, directly pertaining to the alleged purchase of the rocket pods, from the records of an SAI employee found at the Airpark Drive location and from the laptop computer seized from Kane's vehicle, and has given them to the defense. These documents will likely be used in the government's case-in-chief.

With regard to documents seized from the other two locations - "C" Street and the Palmer hangar - they have been available for inspection and copying by the defense since March 21, 2006, pursuant to a signed agreement with defense counsel. Exh. 1. In the meantime, the United States continues to scan, using two scanners, and starting tomorrow a third, all the documents into the ongoing searchable database. Furthermore, since it may take weeks to complete scanning, the United States has allowed defense counsel free access to the documents, pursuant to the parties' agreement reflected in Exh. 1. Defense counsel have been making copy requests of selected documents, even in advance of their production as part of an overall database encompassing all the search locations. Exh. 2. The

FBI has devoted a night crew to making copies overnight and then producing the copied documents the following morning.  Some documents have simply been returned, if they are needed immediately by SAI.  Any such documents are assessed for relevance and evidentiary value, and they have either been copied and given to defense counsel, or simply returned.  See, e.g., Exh. 3 and 4.

In summary, all of the documents in this category (seized from the SAI premises and Defendant Kane's residence) have been: 1) scanned and produced, or 2) made available for inspection, and copying by the government upon request.  Documents are being returned whenever appropriate.

2. **"Documents relating to the witnesses the government alluded to in the search warrant affidavits, Robert Kane's arrest warrant affidavit, Kane's preliminary hearing and detention hearing and Kane's bail review hearing."**

SAI is not seeking relief as to this category of documents. (See pp. 10-12 of Memorandum in Support of Motion to Compel Discovery.)

3. **"Electronic evidence seized from Security Aviation and its affiliated companies."**

The United States has imaged any electronic evidence seized pursuant to the search warrants, and has already returned the computers and other electronic storage devices to the defense.  See Exh. 5 and 6.  This satisfies both Rule 16 and any *Brady/Bagley/Giglio* obligations that may pertain to this category of evidence.

4. **"Inspection of the L-39 aircraft and rocket pods."**

As conceded by defense counsel, defense inspection of the aircraft and the rocket pods has already occurred.  In fact, the rocket pods were inspected

on March 10, 2006, and the aircraft on March 15, 2006, more than a week before the Motion to Compel was filed. By agreement of the parties, the aircraft and rocket pods remain available for further inspection in preparation for trial.

5. **"Aircraft logs of the L-39 aircraft, including all documents referring to modifications or alterations rendering the aircraft systems inoperative."**

Since March 21, 2006, all of the L-39 aircraft logs have been available for inspection, review and copying by the defense. A paralegal for SAI has conducted a review, albeit preliminary, of documents seized from the Palmer hangar, which appear to contain the aircraft logs (e.g. Exh. 9), Czech and Nigerian Air Force technical manuals and other information pertaining to the aircraft.

6. **"Expert reports consisting of a written or recorded summary of any opinion rendered to the government by any expert on the issue of whether the rocketpods seized by the government are destructive devices as charged by the government."**

On March 30, 2006, the United States received the report of Mr. Earl L. Griffith II, expressing his expert finding that (based upon his experience, knowledge, research, and testing) that each of the two rocket pods seized in this case constitutes a "destructive device" as charged by the Indictment. Exh. 10. This report was immediately produced to the defense.

The United States has also informed the defense that it intends to bring an additional expert witness to Alaska. Charles Watson, a civilian munitions expert currently working at Wright-Patterson Air Force Base, is tentatively scheduled to come to Alaska to assist the government in this case during the week of April 10th. The government intends to make both Mr. Griffith II and Mr. Watson available to the defense for interviews at that time. The United States will also promptly produce Mr. Watson's expert report, which will be prepared before his departure from Alaska, to the defense.

> 7. **"Exculpatory material consisting of all materials in the government's possession favorable to Security Aviation and material to guilt or innocence or punishment, including, but not limited to (a) physical and documentary evidence bearing on the history and status of the subject aircraft pods (such as may be present in the files of the BATF, FAA, or other government agency); (b) all documents received from or observed in the possession of any person regarding any demilitarization of the subject rocket pods; (c) all impeachment information concerning the witnesses to be called by the government and (d) any information concerning motive, bias, or interest of a potential government witness."**

The defense concedes that this court's February 27, 2006, Order requires the government to produce *Brady* material "as soon as practicable". The defense's request for this material is a generalized one for "*Brady*, *Bagley* and *Giglio* materials" (Pg. 5, Memorandum in Support of Motion to Compel

Discovery), materials which are expansively argued by the defense to include impeachment evidence in the form of witness statements - even those "otherwise protected from pre-trial discovery by the Jenks Act". (Pg. 9, Memorandum in Support of Motion to Compel Discovery).

While the government does not agree with SAI's expansive interpretation of the government's <u>Brady</u> obligations, particularly at this relatively early point in these proceedings, this is an obligation, rooted in due process, which the government takes very seriously. To that end, the government hereby represents to the court that it has undertaken aggressive efforts to isolate and produce to the defense any such material. The government realizes that this is an ongoing obligation. Due process only requires that disclosure of exculpatory material be made in sufficient time to allow the defendant to make effective use of it. <u>LaMere v Risley</u>, 827 F.2d 622, 625 (9th Cir. 1987). The cases cited by the defense require nothing more. For example, the defense relies upon <u>United States v Lehman</u>, 756 F.2d 725 (9th Cir. 1985) (Memorandum in Support at page 9). However, even <u>Lehman</u> only requires that <u>Brady</u> material be produced at a time sufficient to allow the Defendant to use it effectively. Furthermore, this circuit distinguishes between specific requests for <u>Brady</u> material, and general <u>Brady</u> requests. <u>Lehman</u>

involved a specific request. In this case, the defense has only made a general request. Under such circumstances the United States is not required to guess at its *Brady* obligations at this stage of the proceedings. Even so, the United States has already produced to the defense the key communications between the persons allegedly involved in the purchase of the rocket pods, and any documents which were provided to the government by those witnesses. Some of what these witnesses said - or didn't say - in interviews may constitute *Brady* or impeachment material. No later than April 3, 2006, the United States will provide FBI 302s concerning those key witness interviews, conducted here in Alaska, to the defense. Interviews of these and other witnesses were conducted elsewhere, concerning the rocket pods which are the subject of the Indictment: FBI 302s of those interviews have been produced. The government has made every effort to locate the seized documents likely to constitute proposed trial exhibits, and has turned them over to the defense. Exh. 7, 8 and 9.

    The other two Ninth Circuit authorities cited by the defense, United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988) and United States v. Shafer, 789 F.2d 682 (9th Cir. 1986), do not require *Brady* production at this time. Nevertheless, because the government has interviewed one or more witnesses whose statements

may, if true, constitute *Brady* and/or impeachment material, the United States has already made those statements available to the defense. At this time, however, the defense is doing nothing more than asking the government to guess what else might ultimately be *Brady* information, and produce it now, which is unreasonable, at least for due process purposes. As expressed by the Second Circuit in United States v. Coppa, 267 F.3d 132 (2nd Cir. 2001):

> ...the prosecutor must disclose "material" (in the *Agurs/Bagley* sense) exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if any earlier disclosure had been made... we have never interpreted due process of law as required more than that *Brady* material must be disclosed in time for its effective use at trial.
>
> * * *
>
> [T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached [citations omitted].

**C.    CONCLUSION**

The United States has satisfied each of the discovery requests underlying the Motion to Compel. In addition, the United States has already provided, as a precaution, information about the conduct charged by the Indictment which may implicate *Brady/Bagley/Giglio*. There is no discovery to compel; the Motion should be denied.

U S v. Kane, et.al.
3:06-cr-022-JWS

RESPECTFULLY SUBMITTED this 30th day of March, 2006 at Anchorage, Alaska.

        DEBORAH M. SMITH
        United States Attorney

        s/ Steven. E. Skrocki
        Assistant U.S. Attorney
        222 West 7th Ave., #9, Rm. 253
        Anchorage, AK 99513-7567
        Phone: (907) 271-5071
        Fax: (907) 271-1500
        E-mail: steven.skrocki@usdoj.gov

        s/ James Barkeley
        Assistant U.S. Attorney
        222 West 7th Ave., #9, Rm. 253
        Anchorage, AK 99513-7567
        Phone: (907) 271-5071
        Fax: (907) 271-1500
        E-mail: james.barkeley@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2006
a copy of the foregoing was served
electronically on Robert Bundy,
Allen Clendaniel, Kevin Fitzgerald,
James Kee, & Paul Stockler.

s/ James Barkeley

U S v. Kane, et.al.
3:06-cr-022-JWS