DEBORAH M. SMITH
Acting United States Attorney

STEVEN E. SKROCKI
JAMES BARKELEY
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov
        james.barkeley@usdoj.gov

Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:06-cr-022-JWS |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S** |
| | ) | **RESPONSE AND** |
| vs. | ) | **OPPOSITION TO** |
| | ) | **SECURITY AVIATION'S** |
| ROBERT F. KANE, | ) | **MOTION TO SUPPRESS** |
| a/k/a "COMMANDER KANE," and | ) | **ALL EVIDENCE SEIZED** |
| SECURITY AVIATION, INC., | ) | **PURSUANT TO A FINDING** |
| | ) | **OF PROBABLE CAUSE** |
| Defendant. | ) | **THAT A VIOLATION OF 18** |
| | ) | **U.S.C. § 1343 OCCURRED** |
| | ) | |

COMES NOW the United States by and through counsel and files its

response to defendant Security Aviation's motion to suppress all evidence seized

pursuant to a finding of probable cause that a violation of 18 U.S.C. § 1343

occurred.  Security Aviation's motion fails on the merits as ample probable cause

exists under the totality of the circumstances to establish wire fraud and it similarly

fails as it omits the fact that Special Agent Campe's affidavit incorporates and

adopts the facts from the previous warrant.  Given the overwhelming evidence

relating to fraud and based on the totality of the circumstances the motion must be

denied.

## I.    INTRODUCTION

Security Aviation's motion claims a lack of probable cause exists for the

issuance of warrants 3:06-mj-0016-JDR (The South AirPark Hangar Warrant) and

Warrant 3:06-mj-0018-JDR (The C Street Avery and Associates Warrant) claiming

that nothing in the affidavit of Special Agent Campe  "establish a wire fraud has

occurred".  This motion fails for several reasons.  First, that Security Aviation uses

incorrect legal standard for this proceeding.  The government need not, as Security

Aviation contends, "establish that wire fraud occurred" it need only establish that

*probable cause existed to believe wire fraud occurred*.

The motion ignores the incorporation of the facts laid out in the earlier

warrant and incorporated into the second warrant alleging wire fraud.  Security

Aviation's brief omits the fact that both 3:06-mj-016-JDR and 3:06-mj-018-JDR incorporated the facts set forth in warrants 3:06-mj-08-JDR and  3:06-mj-010-JDR. (See Sealed Exhibit 1, affidavit of Special Agent Matt Campe, warrant 3:06-mj-018-JDR, pg. 2, paragraph 3b., incorporating the probable cause previously stated in Exhibit 1, the original affidavit for search warrant 3:06-mj-010-JDR .)[1]   The motion also ignores the mountain of information present in both the first and the second warrants, which, when viewed either separately or in conjunction with one another provides more than probable cause under the totality of the circumstances to establish probable cause that wire fraud occurred.  Both search warrants establish that probable cause existed to suspect that Mark Avery, Robert Kane and Security Aviation committed wire fraud with respect to the May and Stanley Smith Charitable Trust.  This trust, which the government established was designed only to fund strictly non-charitable purchases, was the suspected source of a $50 million dollar "loan" (via wire transfers) which was funneled into the non-charitable personal purchases of two boats, at least 8 L-39 aircraft, other commercial aircraft, homes, vehicles, salaries, an F4U Corsair World War II  propeller-driven fighter, and other items relative to Mark Avery's extensive and multi-million dollar investment into Security Aviation and a horde of other business ventures, none

---

[1]A similar provision exists in warrant 3:06-mj-016-JDR.

which were charitable in nature.

In light of the foregoing, this motion must be denied.

## II.   FACTS

### A.   THE ACQUISITION OF MILLIONS OF DOLLARS FROM "A TRUST" VIA WIRE TRANSFER

The following facts are a compilation of paragraphs from the C Street and South Airpark Hangar Warrants (they are identical) which, when examined under the totality of the circumstances test of *Illinois v. Gates,* 462 U.S. 212 (1983) establishes beyond any doubt the existence of probable cause for wire fraud.  The facts from both the first warrant and second warrants will be referenced.  The government begins with facts from warrant 3:06-mj-010-JDR, the first Avery and Associates warrant:[2]

### B.   THE FIRST WARRANT: AVERY, KANE, A CHARITABLE TRUST, $50 MILLION DOLLARS IN NEWLY ACQUIRED ASSETS AND NO GOVERNMENT CONTRACTS

Paragraph 8 of the affidavit described Avery is an Anchorage attorney and businessman, residing in Eagle River, Alaska and one of three trustees of the *May*

---

[2]In light of the fact that the motion to unseal the search warrants in this case remains pending the government will paraphrase facts from the search warrant a best it can with specific reference to the paragraph numbers from the warrant.  The government has provided a copy of the Avery and Associates warrant for the court under seal as Exhibit 1.

*and Stanley Smith Charitable Trust*, a trust valued at $357 million as of 2004. The affidavit stated that two witnesses described Avery as using his business computer network at 3230 C Street, Anchorage, Alaska to communicate, perform online banking, and facilitate large value wire transfers.

Paragraph 9 described how the investigation learned that since January 2004, Avery acquired or created through unknown financing sources approximately 15 companies (several being created by Avery on the same day) including aviation charter, aero-medical and other "security" and/or quasi-law enforcement-type businesses with an aggregate unknown value, but a value believed by Special Agent Campe to exceed 50 million dollars. The source of funds or funding methods for these business purchases by Avery was unknown.

Paragraph 11 stated that the investigation reviewed trust documents, including tax filings for the trust, and determined that Mark Avery was one three trustees responsible for the management of the *"May and Stanley Smith Charitable Trust",* (MSSCT) a charitable trust organized in San Francisco, California with a stated fair market for the tax year 2004 in excess of $350 million dollars. The affidavit established that the as detailed below, the stated purpose of the MSSCT was to fund charitable endeavors dedicated to education and other charitable purposes. Two witnesses stated that Avery and Associates has no known legal

associates, employs no other attorneys, and appears to have few, if any legal clients unrelated to either Avery's own businesses, the trust, or the dealings of Robert Kane and another individual. Motznik and INGENS searches revealed a total of one Avery and Associates court filing for the years 2004 and 2005.

The affidavit also stated determined that Avery applied for FAA registration of at least six *Albatross* L-39/59 jets, in the name of Regional Protective Services, LLC and using an address of 3230 C Street, Anchorage, Alaska.

Special Agent Campe's affidavit then informed the court that Avery appeared to have partnered with Robert F. Kane. (¶ 13). The affidavit referenced the fact that Kane was known to use the moniker *"Commander Kane"* despite there being no record of any military service with the United States and that Kane has claimed to have been a Navy *"SEAL"* and has claimed to be or have been, a "commander" in the Philippine Coast Guard, and through other witnesses a pilot, a former special forces operations soldier, and claimed further that he has worked with the FBI, DEA, and CIA. The FBI learned that Kane was listed as an FBI informant until mid-2005 but was no longer acting in that capacity.

Paragraph 15 of the affidavit stated that Kane informed a witness that he (Kane) and his associates in Alaska are currently engaged in "black ops" and that he claimed to be transporting detainees for the U.S. Government from overseas. It

was also explained that Kane and his associates have spent a considerable amount of time explaining to the Alaska law enforcement community and other individuals that the group is legitimately into "black ops" and that it possesses "OPFOR" (opposition force) contracts with the Department of Defense and evacuation contracts with 300 embassies and consulates in the Pacific Rim region.

Special Agent Campe's affidavit stated that he and other investigators with the FBI have contacted the  Department of Defense and the State Department concerning these claims.  The Department of Defense and the State Department denied the existence of any such contracts, nor did a search by other FBI agents of pertinent Department of Defense contractor listings revealed any such contracts.  Paragraph 16 of the affidavit credits Kane on January 28, 2006 with informing another FBI Special Agent in reference to Security Aviation's L-39/59 aircraft that his company had no government contracts, but was currently attempting to get an OPFOR contract with the Air Force.  Paragraph 17 of the affidavit stated that the United States Air Force denied that any contracts were in existence with Security Aviation.

Paragraph 17 stated that Kane and Avery hold themselves out as equal partners in their various business ventures, though investigators have not found any public record or other document indicating Kane's ownership interest in any

property, businesses, vehicles, or bank accounts in Alaska nor any employment records. The affidavit went on to state that on January 26, 2006, Kane stated to a civilian witness formerly employed with Security Aviation, Inc. that, "I have more money than God."  Another witness credited Kane with saying that he (Kane) was worth $660 million that he had inherited from a presidential advisor who had died the previous year.  On January 28, 2006, Kane said in conversation with a government agent that "Avery is the money man".  Agents were unable to find any public records for Kane's home and ownership thereof, save for that it was purchased by an Avery owned company, Regional Property Services, LLC. in 2005.

Paragraph 19 described Kane's prior involvement in cases involving financial fraud involving questionable loans and defrauding of funds and other investigations involving the illegal possession of automatic weapons, grenade launchers, and hand grenades, among other items including the use of a rocket launcher in Oregon in 2003.

The affidavit next states that Avery purchased Security Aviation at some point in mid-2005, for $6 million dollars and then listed all of the Avery created companies. (See ¶26).  This paragraph also stated that Avery and the group have acquired an additional, but undetermined amount of new aircraft, including

"corporate-type" jets such as a Gulfstream III and a Gulfstream II.  In late Fall, 2005, a witness reported that a Security Aviation company, "High Security Aviation," purchased a vintage biplane, a Chance-Vought F4U Corsair, and a P-51 Mustang.  The Corsair and the Mustang's purchase price, according to internet resources for similar airplanes, were believed to exceed $1 million each.

The affidavit then pointed out that Security Aviation had plans to buy two Gulfsteam IV jet aircraft and one Gulfstream V jet aircraft for a reputed $100 million and that in September or October 2005, Kane had stated that Regional Protective Services and Security Aviation had spent $54 million in a 10 day period.

Paragraph 39 established that Regional Protective Services, Inc., had two vessels moored in the new, privately owned Whittier Marina, located east of the present Whittier Small Boat Harbor.  The first vessel, a 40' Carver, is a fiberglass cabin cruiser is identified by the name *"Time in a Bottle"* and had a purchase price of $230,000.  The other vessel, was a yellow "Mooseboat", was purchased by Kane for $500,000 cash.

Paragraphs 42 through 45 of the affidavit were concerned with the May and Stanley Smith Charitable Trust.  These paragraphs established that the trust was established in California by an elderly trustor named May Wong Smith via Mark Avery's father.  The MSSCT was created as an irrevocable private charitable trust

for the express purpose of supporting *only charitable organizations qualified under IRS 501(c)(3) tax-exempt charity designation*. Mark J. Avery inherited his father's trusteeship over the Trust in 2001.      It was also established that Special Agent Campe reviewed the original MSSCT foundation documents and reviewed the 2001 through 2004 Trust federal tax returns from the California Attorney General's Office. These documents indicated that in 2004, the Trust held assets valued at $357 million and distributed $7.8 million in charitable grants. Tax records for 2004 also indicate that Avery and the two other trustees each received an annual salary from the MSSCT of $400,000 per year for "40 hours" of work per week on the trust. The MSST was also charged significant additional fees by the trustees and their family members for unspecified legal work, accounting, and investment consulting. No further explanation was provided detailing what type of work was performed by Avery and the other trustees on behalf of the MSSCT. After March, 2004, Special Agent Campe reported, the Trust ceased filing records in California as it had moved out of state. No records for the trust were located in the state of Alaska.

Paragraphs 54 through 62 were concerned with false statements in the $500,000 line of credit application with Wells Fargo Bank on behalf of Security Aviation and Mark Avery. These paragraphs lay out in some detail evidence of

false statements in the loan processing process with emphasis on the false claim that Security Aviation's growth was fueled by over $100 million dollars in government contracts that did not exist.

Paragraph 63 detailed what was described as suspicious banking activity on the part of Security Aviation. Pursuant to grand jury subpoena one Wells Fargo account for Security Aviation revealed to Special Agent Campe at least 20 separate banking accounts for Security Aviation and related companies. In one account alone Special Agent Campe reviewed expenditures for the period of April, 2005 through October, 2005. The records revealed a total cash flow of approximately $433,000. Of that amount, $252,000 was spent on unknown and apparently private construction contracts, while approximately $181,000 was spent on computerized on-line transfers, on-line withdrawals and loan pay-offs for Kane. Thereafter, Special Agent Campe stated that he received and analyzed records of several bank accounts utilized by the subjects, disclosing suspicious activity. It was stated:

> *The subjects maintain numerous business accounts that show little legitimate business activity, but a great deal of wire transfer and electronic (computerized on-line) banking transfer activity into and out of the accounts by Avery, his wife and his employees at Security Aviation. The sources of the funds in these accounts are wire transfers from accounts for which your Affiant is currently obtaining records. Two (2) particular accounts for CNC Steel Processing, LLC, show the accounts being opened with large incoming wire transfers ($395,000 and $400,000), the entire balance being*

*transferred electronically and by cashier's check to another account, then the CNC account being immediately closed. Alaska Department of Commerce Corporation records indicate that Avery created CNC shortly before the first account was opened. CNC appears to be a shell company with no known business activity. Numerous suspected personal expenditures also appear in the business bank account records.*

¶64

Paragraph 65 established that deposits into another Security Aviation account for the period of September, 2005 through October, 2005 totaled 7.3 million. Subsequent paragraphs detailed Kane's insistence on computer data and communications security, including e-mail encryption, data encryption, system firewalls, and emergency data destruction systems beginning on January 1, 2006. Kane and Avery advised two witnesses that they required extraordinary computer and communications security, including CIA grade encryption, to protect "a trust" and their companies from unspecified outsiders who will scrutinize multi-million dollar international wire transfers by Avery and Kane.

Special Agent Campe's affidavit then stated that Avery and Kane advised two separate witnesses that the "first phase" of their business plan was to purchase and expand aviation businesses in Alaska during 2005. As part of this first phase Kane and Avery indicated that they keep their money outside of Alaska, and that they have notified the FBI prior to performing massive international wire transfers

so that the transfers were not "frozen."  Special Agent Campe noted that there was

no indication that subjects have contacted the FBI to clear their wire transfers.

Avery and Kane then referred several times to "a trust", which Kane once referred

to as "my trust" in the presence of one of the witnesses.  Kane and Avery further

explained that now that these businesses are established, the "second phase" will

begin in 2006, involving obtaining hundreds of millions of dollars from U.S.

Government contracts.

### C.    THE SECOND WARRANT: A 50 MILLION DOLLAR "LOAN", KANE "CONSULTS" FOR $20,000 A YEAR, AND THE SECRETIVE MOVEMENT OF THE TRUSTOR OVERSEAS

The government next moves to facts from the second warrant at the Avery

and Associates address on C Street, 3:06-mj-018-JDR, which included additional

facts, many not referenced by the defense motion.

In making the second warrant application for the C Street and South Airpark

locations Special Agent Campe provided the court with the following additional

facts:

Karen Gamalinda, Robert Kane's spouse was interviewed by the arrest team.

During the interview, she informed agents of the following:

>-That her husband's salary for doing consulting work for Mark Avery
>
>was $5,500-$7,000 per month.

-In summer, 2005, her husband's salary increased to $20,000 per month

- She informed law enforcement investigators that she overheard Robert Kane, Mark Avery and Matt Avery (believed to be Mark Avery's brother) discussing a $50 million loan that involved a collection of interrelated companies. It was her impression that the loan came from a trust and that Mark Avery was in charge of that trust.

-Ms. Gamalinda also stated that she was aware of an "old lady" in the Bahamas and that the "old lady" was taken care of by two former law enforcement agents, husband and wife, who are employed by Avery. This "old lady" is somehow related to the trust administered by Avery.[3]

-All of their vehicles are provided to her husband by Regional Protective Services, Inc., as part of his compensation.

-Her husband received a gift of an F4U Corsair from Mark Avery.

_____

[3]Security Aviation contends that these statements ought be supressed as they were taken in violation of Ms. Kane's rights. First, there are no pending charges against Ms. Kane, and, more importantly, Security Aviation lacks any standing to contest these statements.

The affidavit then underscored additional facts concerning the May and Stanley Smith Charitable Trust.  Special Agent Campe relayed his belief that Avery and Kane appear to have gone to great lengths to conceal the whereabouts of May Wong Smith.  Based on information collected from several sources Agent Campe's affidavit stated he believed that May Wong Smith is very aged and may be suffering from Alzheimer's Disease,  possibly rendering her incapable of cognizant understanding concerning the use of the trust proceeds and corpus.  The affidavit went on to state that investigators had been unable to locate the corpus of the trust, its current legal situs, or trustor May Wong Smith.

The affidavit also provided information from a witness who indicated that he had known Robert Kane since June, 2002 and has had periodic contract with Kane up to the date of the interview.   Kane advised the witness that he  worked for "an old lady" whom he escorted around the world.  Kane further advised that he had picked up the woman in London and taken her to a location in the Caribbean.  The affidavit indicated that since the move attempts to locate the trustor were not fruitful.

Paragraph 26 of the warrant provided the court with additional information from the execution of search 3:06-mj-010-JDR.  That paragraph stated that Special Agent Campe learned from law enforcement officers engaged in the search

pursuant to Search Warrant 3:06-mj-010-JDR that wire transfer records related to a

company named AVENCO LTD,. appeared to be a funding agency for matters

related to May Wong Smith.  Specifically an AVENCO LTD. wire transfer record

dated September 22, 2005 for the amount of $265,291.00 to Regional Protective

Services was discovered in the search.  The financial institution listed as the

funding source for this transfer was AVENCO LTD, under the name of Dale

Matheny, 720 Market Street, Suite 250, San Francisco, California. Special Agent

Campe then stated that he knew his investigation that Dale Matheny is one of three

trustees for the May and Stanley Smith Charitable Trust using the address of 720

Market Street, Suite 250, San Francisco, California.

### III.    ARGUMENT

##### A.    IN A SEARCH WARRANT CONTEXT THE APPROPRIATE STANDARD IS PROBABLE CAUSE, NOT BEYOND A REASONABLE DOUBT

###### 1.    The Search Warrant Affidavits Clearly Meet the *Illinois v. Gates* Standard Regarding Wire Fraud as There is Ample Evidence to Establish Under the Totality of Circumstances that Wire Fraud Occurred and Avery, Security Aviation and Kane Were Involved

Security Aviation's motion begins by providing the court with a cursory and limited examination of the law governing the interpretation of the probable cause standard.  Thereafter, though, once the court moves to the "argument" section, it will see via a close reading of Security Aviation's pleading that it abandons the probable cause standard entirely in favor of the more strict though inappropriate beyond a reasonable doubt standard.  It argues that there is no evidence to establish a fraud occurred or that money was illegally taken from the May and Stanley Smith Charitable Trust.  The defense motion, however, is examining the affidavit in a vacuum and fails to apply the "totality of the circumstances test" of *Illinois v. Gates*.

###### 2.    Search Warrant Sufficiency-General Standards

Probable cause exists when there is a fair probability or substantial chance of criminal activity. *Illinois v. Gates*, 462 U.S. 213, 235,(1983). It is well-settled that

the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search. *Id*. at 238.  As the *Gates* Court points out, the rigid two-prong test from *Aguilar* and *Spinelli* is no longer applied as independent factors, but instead the factors are intertwined such that it is now the rule that court apply a common sense, practical approach of the totality of circumstances test when analyzing the contents of a search warrant affidavit.  *See Gates*, 462 U.S. at 238. A reviewing court may not find a search warrant invalid if the judge had a "substantial basis," under the totality of the circumstances presented in the affidavit, for concluding that the supporting affidavit established probable cause. *Gates,* 462 U.S. at 238-39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983 Probable cause to justify a search warrant exists when there is a sufficient showing that incriminating items are located on the property to which entry is sought. *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir.1988).

### 3.    The Wire Fraud Statute

Title 18 United States Code Section 1343, concerning wire fraud, provides in relevant part that:

> *Whoever, having devised or intending to devise any scheme*
> *or artifice to defraud, or for obtaining money or property by*
> *means of false or fraudulent pretenses, representation, or*
> *promises, transmits or causes to be transmitted by means of*

> *wire, radio, or television communication in interstate or*
> *foreign commerce, any writings, signs, signals, picture, or*
> *sounds for the purpose of executing such scheme or artifice.*
> violates 18 U.S.C. § 1343.

In this case, the search warrant affidavits provide more than a substantial

basis under the totality of the circumstances for concluding that the warrant

established probable cause.

Taken in isolation, or collectively, the warrants provide specific information

that the massive expansion of Security Aviation which occurred in less than one

year and involved expenditures was due to a "loan" of some nature from what was

alleged to be a Internal Revenue Code Section 501(c)(3) charitable trust.  In

making this claim the affidavits attributed this allegation to the statements of both

Avery and Kane and listed several different witnesses.  This type of interlocking

testimony provided the court with extensive and multi-source corroboratoin with

regard to these statements.  Added to that were the statements of Kane's spouse.

The affidavits did not stop there.  As the court knows from its own

examination of the affidavit(s) there existed a significant and omnipresent level of

secrecy concerning the trustee, her whereabouts and capacity to understand what

was indeed occurring with the MSSCT funds.  The affidavit established a

movement of the trustee in early 2005 to the Caribbean, with the placement of

"custodians" hand-picked by Mark Avery to watch over her.  Additionally, the

affidavit established that Robert Kane stated he worked for "an old lady" and that he too was on the trip to the Caribbean when the trustor was moved from England.

Both men made mention of a "trust" and Avery in particular made reference to a "loan". Obviously, the warrants were clear in claiming that the source of Avery and Kane's incredible expenditures in such a short period of time, at least $50 million, came from a raid on the May and Stanley Smith Charitable Trust either via the trust itself or through some type of shell company. Indeed, the affidavit listed specific and general claims of wire transfers of funds into Avery's businesses through Wells Fargo, from Avenco, Ltd and other electronic banking practices.

As indicated above, the court need not examine the affidavits in a vacuum. Indeed, the common sense, "totality of the circumstances" test is designed to take all facts into account, not parcel each into something meaningless. In this case, the court has before it a clear case of probable cause to establish wire fraud. Despite the defense contentions, each and every electronic transaction, whether it be a specific wire transfer, (irrespective of the amount), an electronic transfer of bank funds from one account to another, whether at the same banking institution, or to another, is a specific element of the crime of wire fraud.

What is all the more striking is the defense argument that there is no

evidence of fraud. To the contrary.  The affidavit is replete with probable cause to

believe that the MSSCT is being defrauded by Avery and Kane via massive wired

withdrawls for non-charitable purposes.  Here are just some of the facts which

establish probable cause to believe that wire fraud has occurred.  Each of these

facts is supported by specific evidence in either one or both search warrants:

> -A charitable trust worth over $350 million dollars, for which Mark
> Avery is one of three trustees;

> -An aged and possibly infirm trustor, secreted away in the
> Caribbean watched by Avery's handpicked guardians and no
> known method of contact from the outside, save for Avery and
> perhaps the other trustees;

> -Over $50 million dollars spent from a trust for the purchase of 8
> and upwards of 12 jet fighter/training aircraft , rare and exotic
> World War 2 fighter aircraft ($2 million), two boats ($738,000), a
> home for Kane, a $250,000 year salary for Kane for "consulting"
> businesses, commercial jet aircraft (in the millions), with not one
> of these expenses being "charitable" in nature;

> -A cloak of secrecy and aura of "black ops" at Security Aviation
> projected to conceal the fraud and the company from scrutiny;

-The claims of massive government contracts where there were none. The "government contract" lie was merely a front to cover the fraudulent withdrawal of money. No government contracts existed in the millions of dollars.

-The plan to install CIA grade encryption to conceal what Kane described as millions of dollars of wire transfers coming into Avery and Associates.

-The creation of over 20 businesses, new employees and funding for those endeavors all organized by Mark Avery,

-A myriad of new bank accounts for the funneling and concealment of illicit funds through those companies, with specific wires from AVENCO, Ltd in the amount of $235,000 being deposited into "Regional Protective Services", an Avery owned and created company.

- From April, 2005 through October, 2005 an analysis of just one account revealed a total cash flow of approximately $433,000. Of that amount, $252,000 was spent on unknown and apparently private construction contracts. Approximately $181,000 was spent on computerized on-line transfers, on-line withdrawals and loan

pay-offs for Kane.

-$500,000 being wired into a shell company opened by Mark
Avery and then closed after the funds were withdrawn.

-All of this occurring in less than one year.

From the foregoing the rule of law is clear. The court need not examine
these facts with the blinders on, nor in isolation. The court instead examines the
facts above, and, indeed, all of the facts in both affidavits under the totality of the
circumstances. When it does undertake that analysis, it will conclude that there
existed probable cause to believe that Avery, Kane, Security Aviation, Regional
Protective Services and the other host of Avery created companies were
committing wire fraud against the May and Stanley Smith Charitable Trust. Based
upon the affidavits of Special Agent Campe, the probable cause evidence as to a
violation of 18 U.S.C. § 1343 is irrefutable.

In conclusion, the government makes it clear that the standard here is
probable cause, not beyond a reasonable doubt. Security Aviation's argument
would have the court impose a trial standard in a pretrial setting and claims no
evidence exists establishing that even one penny was fraudulently obtained. In
making that argument Security Aviation ignores the mountain of circumstantial,
direct and corroborated evidence which, based on the totality of circumstances,

establishes probable cause to believe the illegal transfer of funds by wire exceeding

$50 million dollars for non-charitable uses from the May and Stanley Smith

Charitable Trust as suspected in the warrant.

### B.    PLAIN VIEW WOULD COVER THE SEIZURE OF EVIDENCE GIVEN THE BREADTH OF THE WARRANT WITH REGARD TO FINANCIAL CRIMES.

Even if probable cause was lacking, and the government urges in the

strongest terms that this is not the case, the plain view doctrine will operate to cure

any deficiency as agents had authority to look for evidence of false statements to

lending intitutions and were authorized to collect financial records and other

records of a financial nature.

The United States Supreme Court has held that once the police are lawfully

searching in a place for one thing, they may seize another that is in plain view, if

its incriminating nature is immediately apparent. *Horton v. California,* 496 U.S.

128, 136,(1990).   *United States v. Ewain*, 88 F.3d 689, 693 (9th Cir.)(As Amended

June 13, 1996)

In *Ewain*, the 9th Circuit dealt with an argument that an officer who had a

warrant for one item of evidence  but fully expected to find other evidence.  In that

opinion, the Court stated that after *Coolidge v. New Hampshire,* 403 U.S. 443, 465-

66,(1971), it had been thought that the discovery of the additional thing not

described in the warrant had to be "inadvertent."  The *Ewain* court then stated that *Horton* held that inadvertence is not required, finding that if a law enforcement officer had a valid warrant for one item of evidence-in this case evidence of credit card fraud-and  "fully expects" to find another, based on a "suspicion ... whether or not it amounts to probable cause," in this case, evidence of bank fraud,  the suspicion or expectation does not defeat the lawfulness of the seizure. *Ewain*, 88 F.3d at 693,  *citing Horton*, 496 U.S. at 138-39.

On this issue the defendant's motion to suppress deals only with wire fraud. The government therefore reserves the right to respond with further briefing on this issue if necessary or warranted with regard to all aspects of the search warrants at issue in this case.

## IV.   CONCLUSION

The search warrants in this case were supported by an overwhelming amount of direct, circumstantial and interlocking evidence establishing that probable cause existed with regard to wire fraud.  Given that evidence under the

totality of the circumstances the defendant's motion to suppress should be denied.

RESPECTFULLY SUBMITTED this  3<u>rd</u> day of April, 2006 at Anchorage,

Alaska

> DEBORAH M. SMITH
> United States Attorney
>
> s/ Steven. E. Skrocki
> Assistant U.S. Attorney
> 222 West 7th Ave., #9, Rm. 253
> Anchorage, AK 99513-7567
> Phone: (907) 271-5071
> Fax: (907) 271-1500
> E-mail: steven.skrocki@usdoj.gov
>
> s/ James Barkeley
> Assistant U.S. Attorney
> 222 West 7th Ave., #9, Rm. 253
> Anchorage, AK 99513-7567
> Phone: (907) 271-5071
> Fax: (907) 271-1500
> E-mail: james.barkeley@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3rd, 2006
a copy of the foregoing was served
electronically on Robert Bundy,
Allen Clendaniel, Kevin Fitzgerald,
James Kee, & Paul Sockler.

s/ Steven E. Skrocki