DEBORAH M. SMITH
Acting United States Attorney

STEVEN E. SKROCKI
JAMES BARKELEY
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov
       james.barkeley@usdoj.gov

Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:06-cr-022-JWS |
| | ) | |
| Plaintiff, | ) | **UNITED STATES'** |
| | ) | **OPPOSITION TO** |
| vs. | ) | **SECURITY AVIATION** |
| | ) | **INC.'S MOTION TO** |
| ROBERT F. KANE, | ) | **SUPPRESS THE FRUIT OF** |
| a/k/a "COMMANDER KANE," and | ) | **THE JANUARY 21, 2006,** |
| SECURITY AVIATION, INC., | ) | **SEARCH OF SECURITY** |
| | ) | **AVIATION'S PALMER** |
| Defendant. | ) | **HANGAR** |

COMES NOW the United States, by and through counsel, and hereby

opposes Defendant Security Aviation, Inc.'s Motion to Suppress concerning Air

USA's January 21, 2006, repossession of its jet aircraft, aircraft batteries and external fuel tanks from Security Aviation's Palmer hangar.

## I. OVERVIEW

On February 2, 2006, federal agents lawfully executed two search warrants at the Security Aviation aircraft hangar located at 801 East Cope Industrial Way in Palmer, Alaska. The instant Motion seeks the suppression of evidence (including two rocket pods) seized pursuant to the search warrants, alleging that the warrants were tainted by an allegedly unconstitutional prior "governmental" search of the Palmer hangar on January 21, 2006. Nothing of the sort occurred. In fact, there was no search - at least not a search which implicates the Fourth Amendment's prohibition against unreasonable government searches.

On January 20-21, 2006, Air USA, Inc., a company based in Illinois, sent its employee (and former Security Aviation mechanic) John Berens to Palmer to repossess four Air USA jets which Security Aviation had taken delivery of, but had not paid for. On January 21, 2006, Robert Anthony (at the time, a Security Aviation mechanic[1]) unlocked the Palmer hangar for Berens, so that Berens could recover the aircraft batteries and external fuel tanks necessary to start the

---

[1] Anthony has since been dismissed by Security Aviation.

repossessed jets and fly them out of Alaska.[2]

The Motion makes two arguments:

A.    That the January 21, 2006, repossession by Air USA, Inc. was not a private search, but was in fact a warrantless governmental search conducted in violation of the Fourth Amendment.[3]

B.    That the January 21, 2006, hangar entry and observation by Berens was not a valid consent search.[4]

As discussed below, neither argument has merit.

## II. **FACTUAL BASIS**

The facts - as they were on January 21, 2006, and at the time the two search warrants for the Palmer hangar were issued - will be more fully developed at the evidentiary hearing. However, for purposes of this Opposition, the government relies upon the Affidavit submitted by Special Agent Campe in support of the warrant applications. In addition, the government is likely to elicit the following

---

[2] While Berens was lawfully in the hangar recovering the batteries and fuel tanks, he saw, in plain view, a rocket pod. His observation was not even a "search" for Fourth Amendment purposes. Even if it was a "search", Berens' observation of the rocket pod was private, not governmental, in character. The fact that SA Matt Campe of the FBI was present when Berens observed the pod does not change the private character of Berens' observation. The government did not rely upon the agent's observation of the rocket pod and did not refer to it in Special Agent Campe's Affidavit.

[3] See pp 4-5 of Memorandum in Support of Motion to Suppress.

[4] See pp 5-7 of the Memorandum in Support of Motion to Suppress.

facts relevant to the Motion.

On or about October 21, 2005, Wilbur Hooks, Assistant Federal Security Director for Law Enforcement at the Ted Stevens Anchorage International Airport, contacted SA Campe regarding something Hooks had observed at the Security Aviation hangar on Airpark Drive in Anchorage. Hooks stated that during a tour of Security Aviation's Airpark Drive hangar, defendant Robert F. Kane had shown Hooks something that Kane implied was some sort of weapon, concealed beneath a tarp in the hangar. Hooks believed it to be some type of rocket launching device. Shortly thereafter, Hooks identified what Kane had shown him as the type of rocket launcher shown in the photograph at page 19 of Exhibit 1 to SA Campe's Affidavit in Support of the Application for Search Warrant in case no. 3:06-mj-0009-JDR.

SA Campe had no contact with "Witness E" (John Berens, a former Security Aviation mechanic) until after Campe was contacted by a BATF agent, approximately one week before the events of January 21, 2006. The BATF agent informed Campe that a Mr. Berens had contacted BATF in the lower 48 states, and Mr. Berens (whose contact information was given to SA Campe) had indicated that Berens had recently observed one or more rocket pods at Security Aviation's Palmer hangar (in December 2005). Berens also advised BATF that Berens would

be coming to Alaska in the very near future, in an effort to repossess several L-39 fighter jets (L-59 prototypes) which were in Security Aviation's possession but had not been paid for.

SA Campe first spoke with Mr. Berens when Berens arrived in Alaska to repossess the aircraft on behalf of Berens' employer, Air USA Inc., approximately one or two days before January 21, 2006.  On January 21, 2006, Berens called SA Campe and advised Campe that Berens had already repossessed the aircraft, which had been towed to an adjacent hangar not controlled by Security Aviation, at the Palmer airport.  However, Berens advised Campe that Berens also needed to repossess fuel tanks and batteries, both of which were necessary for flying the aircraft away from the Palmer airport.  The fuel tanks and the batteries, Berens advised, were located in the Security Aviation hangar.  Berens suggested to SA Campe that Berens could either take photographs of them, or that SA Campe could accompany Berens into the hangar.

SA Campe elected to accompany Berens.  SA Campe, dressed in plain clothes, and Berens were allowed into the Security Aviation hangar by a Security Aviation employee, Mr. Anthony.  No one asked who Campe was or questioned why he was with Berens.  Campe was not introduced or identified in any way. Berens went to the second floor of the hangar, accompanied by SA Campe, where

the batteries and fuel tanks were located. SA Campe was present in the hangar (from entry to departure) for no more than 60 seconds. SA Campe took a few photographs of a rocket pod, which was in plain view on a shelf with other aircraft parts. Neither he nor Berens saw the other rocket pod, which was seized on February 2, 2006, pursuant to search warrant. Berens repossessed the batteries and fuel tanks, without any assistance or participation from SA Campe.

### III.   ARGUMENT

#### A.   Berens' Observation of the Rocket Pod In Plain View Was Not a "Search"

A "search" within the meaning of the Fourth Amendment involves governmental prying into hidden places for that which is concealed by a person exhibiting a "legitimate expectation of privacy." Rakas v. Illinois, 439 U.S. 128,143 (1978). "What a person knowingly exposes to the public, even in his own home or office, in not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967).

The visual observation of a police officer, situated in a place where he has a right to be, is not a search within the meaning of the Fourth Amendment. Ponce v. Craven , 409 F.2nd 621, 625 (9th Cir. 1969). Therefore, even if Berens' conduct was "governmental in character" because of SA Campe's mere presence at the

hangar (which it was not, under applicable case law) Berens' visual observations of the pod were not a "search." Berens had the legal right to be there, to retrieve the aircraft batteries and external fuel tanks necessary to fly the jets out of Alaska.

### B. If a Search Occurred At All, at Air USA's January 21, 2006 Repossession Was a Private Search

1. The burden of establishing government involvement in any private search rests on the defendant. United States v. Snowadzki, 723 F.2d 1427 (9th Cir. 1984).

2. The Fourth Amendment does not provide protection against searches by private individuals acting in a private capacity. See United States v. Jacobsen, 466 US 109, 113 (1984). The Fourth Amendment protects against unreasonable intrusions by the government, but not against the conduct of private individuals. United States v. Sherwin, 539 F.2d 1, 5-6 (9th Cir. 1976) (citing Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971). "[E]vidence discovered in a private search is not subject to exclusion for failure to obtain a search warrant or otherwise comply with the requirements of the fourth amendment." Sherwin at 6.

In Coolidge, the Supreme Court ruled that the Fourth Amendment applies only when the private party "in light of all the circumstances of the case, must be regarded as acting as an 'instrument' or agent of the state." 403 U.S. at 487.

Some degree of state or governmental knowledge, encouragement, acquiescence or involvement is necessary before a private person's search implicates the Fourth Amendment.  <u>Sherwin</u> at 6.  Once a private search is completed, subsequent government agent involvement does not retroactively transform the original private conduct into a governmental search.  <u>Id.</u>

The Ninth Circuit has characterized private party searches which involve government agents in some capacity as a "gray area".  <u>Id.</u>; <u>United States v. Walther</u>, 652 F.2d 788, 791 (9th Cir. 1981).  In this circuit, cases falling within the "gray area" " ... can best be resolved on a case-by-case basis with the consistent application of certain general principles."  <u>Walther</u> at 971.

Mere governmental authorization of a particular private search, in the absence of active participation or encouragement is not sufficient to implicate the Fourth Amendment.  <u>Ibid</u> at 972.  Furthermore, the mere presence of law enforcement officers, who take no active role in encouraging or assisting an otherwise private search, is not sufficient to transform the private search into a government search and therefore to implicate the Fourth Amendment, particularly where the private party has a "legitimate, independent motivation" for conducting the search.  <u>Id.</u>, <u>citing</u> <u>United States v. Gomez</u>, 641 F.2d 643 (9th Cir. 1979).

For Fourth Amendment purposes, searches may be regarded as private even

though there was governmental involvement prior to completion of the search. See e.g., Coolidge, 403 U.S. 443, 485-90 (search instigated by police and conducted in their presence); Gold v. United States, 378 F.2d 588, 591 (9th Cir. 1967) (search made after government tip). Consistent with these principles, all SA Campe did was enter the hangar with Berens, who was there to repossess the property for Air USA, Inc.

An example of a "legitimate, independent motivation" behind a private search is illustrated in United States v. Cleaveland, 38 F.3d 1092 (9th Cir. 1995). In Cleaveland, a public utility, received an anonymous tip that there was an illegal power diversion, which might be connected to a possible marijuana grow operation. 38 F.3d at 1093. The utility contacted the police, in part for the protection of its personnel in case they encountered the offender, and in part because the utility "wanted the police to be able to get a warrant to search the house" to confirm the power theft. Id. The police accompanied utility personnel to the property, while the meter was being inspected. The police used the information gathered by the utility to obtain a search warrant, executed the warrant and found contraband and other evidence.

In moving to suppress the evidence, the defendant argued that the meter inspection and the gathering of other information used in the search warrant

application was done at the behest of the police.  The <u>Cleaveland</u> court set out the appropriate test: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." (<u>quoting</u> <u>United States v. Reed</u>, 15 F.3d 928, 931 (9th Cir. 1994)).

The court held that the utility had a "legitimate, independent motivation" to further its own ends.  <u>Cleaveland</u> at 1094.  The utility's motivation - at least in part - was to recover money for its loss of power.  The court noted that what the utility did in going onto the property and inspecting the meter was perfectly lawful.  <u>Id.</u>  The court recognized that the mere existence of a legitimate, independent motive (apart from crime detection or prevention) does not immunize a private search from Fourth Amendment scrutiny; however, in that case the government's involvement in the search itself was minimal.  <u>Id.</u>  The fact that the utility wished to assist law enforcement, in addition to recover money for the theft of its electricity, did not render its private search governmental in character.  Such dual motives do not render a private search governmental. <u>See also</u> <u>United States v. Gumerlock</u>, 590 F.2d 794, 800 (9th Cir. 1979).

The facts in this case are similar to those in <u>Cleaveland</u>, in that even if Berens or Air USA, Inc., wished to assist the FBI in its investigation, they had (and

acted upon) a legitimate, independent motivation. They wanted their jets, fuel tanks and batteries back.

The Ninth Circuit has examined the "governmental knowledge" prong of this two-part test. United States v. Jarrett, 338 F.3d 339 (9th Cir. 2003). More than mere knowledge and passive acquiescence by the Government is required before finding an agency relationship. In that case, despite government communications with a computer hacker, the Ninth Circuit held that the government involvement or "encouragement" necessary to negate the private character of a search, would have to signal affirmatively that the Government would be a ready and willing participant in an illegal search." Id. at 348. There was no such FBI involvement or encouragement in this case. The entry and repossession were lawful.

The Motion relies almost exclusively on United States v. Reed, 15 F.3d 928 (9th Cir. 1994). Reed is completely distinguishable from this case. In Reed, the hotel manager contacted Anchorage police and relayed his suspicions that one of his guests was using his hotel room for drug dealing. The manager asked that the police to accompany him, for his safety, while he checked on the defendant's room. Police officers did so. The officers stood by the door while the manager used his master key to enter the room. Drug paraphernalia were in plain view. Both the police and the manager recognized that the room was in clean and good

condition. Nevertheless, the manager rummaged through dresser drawers, admitting that he was "snooping" and opened the defendant's latched briefcase. Police listened in the doorway as the manager described what he was finding. The police then obtained and executed a search warrant.

Under the two-part test applicable in this circuit, the police in Reed obviously knew of and acquiesced in the search. The only question was: in opening the drawers and the briefcase, did the manager intend to further his own ends, or did he do that solely to assist law enforcement? Reed at 931.[5] The manager did not stop searching the room after he observed that it was in good condition. He opened and closed drawers and unlatched the briefcase, intrusions which the court ruled could not be justified by any need to "protect hotel property"; in fact, the manager himself admitted that he had no such motivation. Ruling that the private search had been governmental in character, the court noted that the officers served a vital purpose as lookouts. Reed at 932.

Most significant, however, is the finding in Reed that, despite the impropriety of all the observations made by the hotel manager and the officers during the initial search by the manager having been included in the affidavit for

---

[5] Watson had attended several classes sponsored by the Anchorage Police Department on how to determine when hotel guests might be dealing in drugs

the subsequent search warrant, the warrant was upheld because it contained independent probable cause. Reed at 933. The mere inclusion of tainted evidence in an affidavit, does not, by itself, taint the warrant or the evidence seized pursuant to the warrant. United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987) Citing Vasey, the court in Reed examined whether the remaining untainted evidence would have provided a neutral magistrate with probable cause to issue a warrant.

In this case, the repossession by Air USA was a private action outside the scope of the Fourth Amendment. The FBI agent did not act as a lookout, nor did he assist in the repossession in any way. SA Campe was simply a passive, invited observer, who only saw (in a matter of seconds) exactly what Berens saw: an apparently intact rocket pod in plain view.[6] Neither Campe's observations nor the photos he took were even referenced in the affidavit used to support application for the search warrant since he and Berens saw the same thing. The warrants for the Palmer Hangar were not tainted by anything that happened on January 21, 2006.

### C.    The "No-Consent" Argument Has No Merit

The defense agues that Berens did not lawfully obtain Anthony's consent to

---

[6] SA Campe will also testify that the rocket pods presented a grave public danger, allegedly stored in the same location as the L-39 jets with which they were compatible. Campe had researched rocket pods and believed he could more accurately document the pods than could Berens, who had offered to do so but had his own reasons for entering the hangar (repossession).

enter the hangar.

    Because John Berens' observation of the rocket pod took place during a private entry supported by the legitimate, independent motivation to repossess four Air USA L-39 aircraft and the batteries and external fuel tanks necessary for flight, consent is not an issue because the Fourth Amendment was not implicated. Security Aviation argues that "Witness I" (Robert Anthony) lacked actual authority to consent to a search of the hangar. The issue of consent is irrelevant in the context of a private search. Consent is only an issue when it is invoked as an exception to the warrant requirement of the Fourth Amendment.[7] The Fourth Amendment does not apply to private searches. Thus, the issue of actual versus apparent authority for purposes of a third party giving consent to the search of another's belongings or property is implicated only when a law enforcement officer is the party asking for consent. In such cases, the officer's reasonableness

---

[7] Even if Berens had not obtained consent from Anthony, the United States would not be precluded from using Berens' observation of the rocket pod to apply for and obtain a search warrant. The Fourth Amendment is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official. See Walter v. United States, 447 US 649, 656 (1980) "a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and ... such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." (citing Coolidge, 403 US at 487-90).

concerning apparent authority is examined. See, e.g. United States v. Welch, 4 F.3d 761, 764-65 (9th Cir. 1993).

As established by the facts of this case, John Berens was not a government agent. John Berens had a legitimate, independent motivation (repossession) for going to the second floor of the hangar, where the rocket pod was on a shelf in plain view near the aircraft batteries and external fuel tanks that he was there to recover.

The Ninth Circuit has examined the consent issue, in the context of a "gray area" government-private search case. In United States v. Miller, 688 F.2d 652 (9th Cir. 1982), a theft victim (Szombathy) had extensive contact with police before making visits to Miller's property and obtaining evidence which was used to convict Miller of receiving stolen property. Szombathy's property was stolen in the State of Washington; an FBI agent invited Szombathy to a small town in Montana, so that Szombathy could possibly identify whether a trailer which had been put up for sale was the one stolen from Szombathy. Miller at 657. Szombathy, acted, at least in part, out of a desire to recover his stolen property. Id. Eventually, with FBI acquiescence and knowledge, Szombathy obtained permission from the defendant's son by pretending to be a prospective trailer buyer and not disclosing the real purpose of his visit. "This alleged pretext did not spoil

the fruits of Szombathy's visit." Miller at 659.  Once Szombathy was on the property, he saw his trailer and other stolen equipment, in plain view.  The court held that the defendant could not claim any reasonable expectation of privacy "with regard to objects in plain view of those invited onto his premises." Id at 658.

In this case, John Berens was not a government agent.  Anthony knew who Berens was and why Berens was there. There was no pretext.  Even if Berens could be perceived as having acted as a government agent on January 21, 2006, Berens obtained consent from Anthony, someone who (at least) objectively and reasonably appeared to Berens to have authority to grant access to the hangar.  Once inside, the rocket pod was in plain view.  Unlike the Reed case relied upon the defense, in which the hotel manager opened secured areas such as dresser drawers and a latched briefcase, nothing intrusive occurred.  Anthony unlocked the hangar door, Berens went to the second floor to retrieve his company's property (which was necessary to fly the aircraft being repossessed out of Palmer) and there in plain view was a rocket pod.[8]

---

[8] The government also relies upon the inevitable discovery doctrine.  Less than two weeks after Berens observations, the government executed search warrants and would have found the rocket pods at that time.  The warrants authorized the search for evidence pertaining not only to rocket pods, but also for evidence of conspiracy, wire fraud, false statements and other offenses. "If the

## IV.  CONCLUSION

Air USA's January 21, 2006, entry into the Security Aviation hangar in Palmer was for the lawful purpose of repossessing its aircraft, batteries and fuel tanks.  John Berens' observation of the rocket pod, in plain view, was not a search for Fourth Amendment purposes.  Even if it was a search, it was private in character and did not implicate the Fourth Amendment.  SA Campe was merely present.  Berens was not acting as a government agent, but instead was motivated by an independent legitimate repossession effort.

Even if Berens had been a government agent, he had a right to be on the second floor of the hangar looking for aircraft equipment.  SA Campe was also lawfully present. The rocket pod was in plain view, falling within an exception to the warrant requirement for governmental searches. Anthony consented to Berens' entry, even though consent was unnecessary because there was no search, or because whatever search occurred was private.

What happened at the Palmer hangar on January 21, 2006 was entirely lawful.  There is no basis for suppressing the destructive devices, or any other

---

prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means...then the deterrence rational has so little basis that the evidence should be received." Nix v. Williams, 467 U.S. 431, 444 (1983).

evidence seized pursuant to those warrants, from the Palmer hangar. The motion should be denied.

 RESPECTFULLY SUBMITTED this 3rd day of April, 2006 at Anchorage, Alaska.

        DEBORAH M. SMITH
        United States Attorney

        s/ Steven. E. Skrocki
        Assistant U.S. Attorney
        222 West 7th Ave., #9, Rm. 253
        Anchorage, AK 99513-7567
        Phone: (907) 271-5071
        Fax: (907) 271-1500
        E-mail: steven.skrocki@usdoj.gov

        s/ James Barkeley
        Assistant U.S. Attorney
        222 West 7th Ave., #9, Rm. 253
        Anchorage, AK 99513-7567
        Phone: (907) 271-5071
        Fax: (907) 271-1500
        E-mail: james.barkeley@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2006 a copy of the foregoing was served electronically on Robert Bundy, Allen Clendaniel, Kevin Fitzgerald, James Kee, & Paul Stockler.

s/ James Barkeley