**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA | **3-06-cr-00022-JWS-JDR** |
| Plaintiff, | |
| vs. | **RECOMMENDATION ON SECURITY AVIATION'S MOTION TO SUPPRESS EVIDENCE OF SEARCH AT PALMER HANGAR** |
| ROBERT F. KANE, a.k.a. Commander Kane, and SECURITY AVIATION, INC., | |
| Defendants. | (Docket Entry 71) |

The court has now before it a motion by Security Aviation, Inc. To suppress evidence in the above-entitled matter.  Said motion is made on the grounds that certain evidence was the fruit of a warrantless and unconstitutional search of Security Aviation's hangar on January 21, 2006.  The motion is opposed by the government at docket entry 104.  An evidentiary hearing was held on this matter.  For reasons that follow, the magistrate judge recommends adoption of factual findings and conclusions of law set forth below and that the motion to suppress be denied.

**Facts**

John Berens worked for Security Aviation as an L-39 aircraft mechanic from the middle of September to the end of December 2005.  In December 2005 while still working at Security Aviation, he contacted SA Pete McCole, ATF over his concerns about rocket launchers observed at Security Aviation.  Agent McCole referred Berens to SA Matthew Campe, FBI.  Berens told Agent Campe by telephone on January 19, 2006 that Security Aviation had rocket pod/launchers in its Palmer hangar, and they were not demilitarized and appeared to be operational.

On January 21, 2006, Berens worked with Air USA, a business owned and operated by Don Kirlin.  Air USA had entered into a contract to sell Security Aviation four aircraft.  According to Berens, Security Aviation refused to pay the balance owed for the aircraft, and Air USA took steps to repossess four L-39 aircraft.

On January 19, 2006, Berens came to Anchorage to repossess the aircraft.  He told Agent Campe over the telephone that he was in town to repossess the airplanes and that the owner of Air USA had the necessary paperwork showing the right to possess the planes.  Berens told Agent Campe he was going to recover the drop tanks for several of the planes and asked Agent Campe if he could go into the hangar when he went in.  Berens did not explain to Agent Campe how they would get inside the hangar.  He did not ask Agent Campe for any help on repossessing the aircraft.  Agent Campe did not ask to see any of Berens

documentation regarding the repossession.   Agent Campe considered he was engaged in undercover work to investigate the rocket pods.

On Saturday, January 21, 2006, Berens went to the Palmer airport where the four planes were stored on the tarmac at Security Aviation.  He used a tow bar to pull the planes off the ramp to the vicinity of another hangar.  Berens was accompanied by Don Kirlin and Michael Vales; Mark Sheets was at the Security Aviation hangar but did not go with Berens to pick up the airplanes.  The airplanes appeared to be flyable with modifications.  The planes did not have fuel drop tanks mounted, nor did two of them have batteries.  Berens  believed these items were in the storage area of Security Aviation's hangar at Palmer.  To gain access to the security hangar Berens called Bob Anthony, an employee with Security Aviation, and told him he had repossessed four airplanes and needed the fuel tanks and batteries that corresponded to the planes.  Anthony was at his home but agreed to come to the hangar.

After he recovered the four planes Berens telephoned Campe that he might have legal access to the Security Aviation hangar, but he had made no arrangements. Berens suggested to Campe that he could enter the hangar alone and take pictures, or that Campe could come with him into the hangar.  Campe chose to accompany Berens and agreed to meet Berens at the hangar.  There, he

met Berens for the first time.  Berens informed Agent Campe that he had clearance to enter the hangar.

When Berens left the employ of Security Aviation, he had been Anthony's supervisor.  Berens did not know whether Anthony held the same position that he had held since Berens left the employment of Security Aviation. Agent Campe requested Berens not to identify him as a government agent.  Berens and Agent Campe proceeded to the Security Aviation hangar where Berens met Anthony.

Berens told Anthony that he needed the drop tanks and batteries that specifically went to the aircraft which were then on the tarmac.  He also told Anthony that he, Berens, had contacted the Palmer Police about his intention to repossess the airplanes.  Anthony had no independent knowledge about the financial dealings between Security Aviation and Air USA.  Anthony knew that the four airplanes did not have current certificates, and he asked Berens how he was going to transport them.  Berens indicated that he had "ferry permits," but the permits were not displayed to Anthony.   Anthony unlocked the hangar and let Berens, Don Kirlin, Michael Vales, and Agent Campe enter.  Anthony handed the key to Berens and told him "you know where they are at."  He did not ask for the identity of Campe; Agent Campe did not identify himself to Anthony.  After handing over the key, Anthony left the premises.

Agent Campe followed Berens across the hangar bay past several airplanes and up a flight of stairs to a parts storage room. The rocket pods were on the shelf next to the tanks and batteries. Berens looked around and said, "there is a rocket pod! That is not demilled. It would have holes in it." Nearby, Agent Campe saw a second rocket pod cone. Agent Campe took five photographs of the rocket pod and immediately left the building. Agent Campe did not search the room. Berens grabbed several batteries and he headed outdoors. Berens told Agent Campe that he thought there was another rocket pod in the hangar. The agent did not return to the hangar while Berens and his companions made several trips to obtain the tanks, batteries, and rocket pod covers. None of the entering parties conducted any general rummaging of the hangar.

On January 23, 2006, Anthony wrote out a statement that he had not let anyone enter the Security Aviation hangar. Anthony subsequently told his supervisor that he had made a false statement. Anthony was fired by Security Aviation. As of December 2005 Anthony understood that he could allow visitors into the Security Aviation Palmer hangar. He signed a document entitled Record System Policy and Employee Nondisclosure Agreement on December 22, 2005. Nowhere in the document does it address access to a hangar. In fact, the day Anthony let Berens enter the hangar, he believed he had the right to do so.

When Sheets was fired for refusing to sign a confidentiality agreement, he came back to Security Aviation's premises with Berens to retrieve his tools. This event caused the management at Security Aviation to establish a policy of who should be notified in the event a non-employee wanted access to the premises. The policy went into effect after Berens left employment with Security Aviation.

Agent Campe considered that he did not have a confidential informant relationship with Berens. In his estimation, Berens was just another witness. There was no money or payment of any kind made to Berens. Agent Campe was concerned about whether Security Aviation had live illegal rocket pods. About January 30, he began drafting a search warrant application for the Security Aviation hangar. He did not mention his presence in the hangar in the affidavit.

### Discussion

Security Aviation's motion argues that the probable cause finding of illegal possession and importation of an unregistered destructive device in warrants 3:06-mj-0009-JDR and 3:06-mj-0017-JDR to search Security Aviation's Palmer hangar are tainted because they were issued in part based upon a January 21, 2006, illegal search of those premises. The motion seeks to have stricken from the warrant affidavit paragraphs 33(b) and 34 which address the January 21, 2006, entry by Witness E (Berens) and Agent Campe.

Security Aviation's central position is that search of the hangar was not a search by a private citizen, but instead was an illegal warrantless government search. Security Aviation posits that Agent Campe knew and acquiesced in the "intrusive conduct" of the search, thereby making Berens a government instrument or agent. The Fourth Amendment generally does not protect against unreasonable intrusions by private individuals. Walter v. United States, 447 U.S. 649, 656 (1980). The burden is on the defendant to show government action. United States v. Gumerlock, 590 F.2d 794 (9th Cir.) (en banc), cert.denied, 441 U.S. 948 (1979).

Security Aviation posits that Agent Campe knew and acquiesced in the "intrusive conduct" of the search, thereby making Berens a government instrument or agent. Security Aviation cites United States v. Reed, 15 F.3d 928, 931 (9th Cir. 1993) wherein the Ninth Circuit instructs: the test for whether government action is present is (1) whether the government knew and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends.

Reed does not define "intrusive conduct," but the facts of the case were that the general manager of a motel told police he suspected that one of his guests was using his hotel room for drug activities and entered the guest's room in his absence using a master key while accompanied by two police officers. Although the manager immediately recognized that the room was clean and in good condition, he

proceeded to go through dresser drawers and open the guest's (Reed's) latched briefcase. The officers stood by while this occurred. When Reed arrived shortly thereafter, he refused to consent to a search of his room. The Ninth Circuit rejected the trial judge's conclusion that the initial search of Reed's motel room did not violate the Fourth Amendment. The Reed court found that the motel manager had no legitimate motive for entering the room other than crime prevention and had engaged in conduct prohibited by law. The court specifically found that the motel manager's alleged "legitimate independent motivation" was a pretext to search for evidence of narcotics trafficking. *Id.* at 933.

In the instant case, Agent Campe knew that one of the purposes Berens had for entering the hangar was to show him the rocket pods if they were still located where he had seen them previously. Thus, the first part of the Reed test is met: the government knew about and participated in the intrusive search.

The second part of the Reed test presents the question of whether Berens was performing a search intended to assist law enforcement efforts or furthering his own ends. In the instant case, he intended to do both. Berens' own entry into the hangar to retrieve fuel tanks and batteries matching airplanes he had just repossessed was not conduct prohibited by law. The law provides that a search will be deemed subject to Fourth Amendment restrictions if it is a "joint endeavor" involving both a private person and government official. Corngold v. United States,

367 F.2d 1 (9th Cir. 1966).  It is not essential that the government agent be involved in the endeavor at the very outset.  It is immaterial whether the government agent "originated the idea or joined in it while the search was in progress" as long as the officer "was in it before the object of the search was completely accomplished." United States v. Ogden, 485 F.2d 536 (9th Cir. 1973), *citing*, Lustig v. United States, 338 U.S. 74 (1949).  The courts have ruled that sufficient government involvement occurs where the officer was standing by giving tacit approval to the entry made by a private person.  Here, Agent Campe accompanied Berens into the hangar.

      The government argues that any search that occurred at the hangar on January 21, 2006, was only a private search.  The government's position would have the court conclude that there were two separate searches.  One search by Berens, and one search by Campe.  In an abstract sense, this is true.  But under the applicable test set forth in Reed, *supra,* Campe crossed the line from passive observer to participant.  The government went beyond knowing and acquiescing in the intrusive conduct.  It would be the wildest sort of fiction to conclude that by Campe's entering the hangar and going to the area in question with Berens, Campe's conduct was somehow independent of Berens.  Essentially, they searched together.  They used their own separate eyes to perceive what they searched, but they searched together nonetheless.  When police officers enter a residence

together and make concomitant observations, they are not engaging in separate searches.  They are several individuals engaging in the same search.

The government cites United States v. Cleaveland, 38 F.3d 1092 (9th Cir. 1995).  That case is readily distinguishable.  In Cleaveland, the appellate court held that despite the presence of police nearby during an electric company search on the defendant's property, the electric company was not the agent of the government during the search.  The Portland General Electric Company (PGE) was responsible for locating power diversions and collecting money owed the company for theft of its electricity.  A company supervisor told police that he was going to inspect the electric meter at Cleaveland's house and wanted the police to be present in the event the situation became dangerous.  He also wanted the police to be able to get a warrant to search the house in the event his inspection uncovered the likelihood of a power diversion.  The supervisor and a technician went onto Cleaveland's property and examined the meter, finding additional lines entering the house.  Based on this evidence the police obtained a warrant to search Cleaveland's house.

The Ninth Circuit found that the police knew of and acquiesced to PGE's search of the meter at Cleaveland's house, thus meeting the first of Reed's two-part test.  The question before the court was whether PGE intended to assist law enforcement efforts or further its own ends.  In concluding that PGE had a legitimate

independent motivation to further its own ends, the court added that the motivation was not negated by any dual motive to detect or prevent crime or assist the police, or by the presence of the police nearby during the search.  38 F.3d at 1094.  As in the instant case, PGE had initiated the plan to inspect the meter.  There was no reason for the police to have discouraged the PGE employee who never exceeded his authority by going onto the property and inspecting the meter.

Cleaveland is materially different than the instant case because in the instant case, the law officer actively participated in the search.  The Cleaveland court specifically found that the government's participation was "not so extensive as to trigger Fourth Amendment scrutiny."  *Id.*  That is not the case before this court.  Contrary to the government's position, there was FBI involvement in the search of the hangar.  Although Berens intended to further his own ends by entering the hangar, his intent to assist law enforcement coupled with the presence of the FBI agent during the entry meets the second part of the Reed test. Thus, Security Aviation's motion is well taken on the point that this was a government search to which the Fourth Amendment applies.  But that does not end the inquiry.

### Consent to Search

When a person has a right to search in a particular place or seize certain property by virtue of his own personal relationship to the premises in question, that right is not diminished by the individual's relationship with law

enforcement.  The parties dispute whether Berens obtained lawful consent to enter the hangar.  Because the Fourth Amendment applies in the instant case, consent becomes an issue because it constitutes an exception to the warrant requirement of the Fourth Amendment.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Security Aviation argues that Anthony's consent for Berens and Campe to enter the hangar was not valid because Anthony lacked the authority to give such consent.

The police may lawfully obtain consent to intrude into an area of privacy by resort to deceit, trickery, or misrepresentation, including deception that goes to the identity of the person seeking consent.  The law enforcement officer may conceal the fact that he is a policeman.  Likewise, he may conceal the identity of the individual accompanying him, and the individual (here Berens) may conceal that he has agreed to act on behalf of the police.  *See*, On Lee v. United States, 343 U.S. 747 (1952); Hoffa v. United States, 385 U.S. 293 (1966); and Lewis v. United States, 385 U.S. 206 (1966).  Thus, consent is not vitiated merely because it would not have been given but for the non-disclosure (or affirmative misrepresentation) which made the consenting party unaware of the other person's identity as a police officer or police agent.  *See also*, United States v. Bramble 103 F.3d 1475 (9th Cir. 1996).

The courts have recognized that legitimate law enforcement interests require persons to take the risk that those with whom they associate may be government agents.  "[T]he Fourth Amendment affords no protection to the person

who voluntarily reveals incriminating evidence to one who is a government agent in the mistaken belief that the latter will not disclose it." United States v. Haden 397 F.2d 460 (7th Cir. 1968).

In the instant case the law enforcement officer took no affirmative action in bringing about any misunderstanding Anthony may have had as to the dual purpose for entering that Berens may have had. Consent to enter given by Anthony was not based on any misrepresentation or show of force by Agent Campe. Nor was any outright or subtle show of force made by Berens, for example, by adding to his declared purpose to retrieve the fuel tanks and batteries that he was being accompanied by a law enforcement officer. Permission to enter was given by Anthony voluntarily based on his prior acquaintance with Berens and his acceptance of Berens' statement that he needed to retrieve the items that matched the planes being repossessed. The deception used by Agent Campe in concealing his true purpose was "fair" within the balance of the need for effective law enforcement and the Fourth Amendment's protection against unreasonable searches and seizures.

### Authority to Consent to Search

Entry into the hangar was with permission of Robert Anthony, an aircraft mechanic with Security Aviation. Agent Campe was entitled to believe that Anthony had authority to admit them. Anthony had the keys and told Berens that the fuel

tanks and batteries he was looking for were in the hangar storage.   Anthony admitted Berens and Agent Campe without asking the identity of Agent Campe.

Security Aviation argues that Anthony did not have the authority to let anyone into the Palmer hangar on January 21, 2006.  According to John Spencer who became Anthony's supervisor on January 2, 2005, after Berens had left employment at Security Aviation, Anthony was informed that non-Security Aviation personnel were not permitted in the Palmer hangar without the approval of Gary Cost who was the person responsible for access to the Palmer facility.  Anthony had earlier signed a non-disclosure agreement, exhibit 1, but it stated nothing about not letting people in a hangar.  Prior to January 21, 2006, Berens had called Anthony from Iowa to inform him that he was not returning to the employ of Security Aviation.  On January 21, 2006, Berens asked Anthony to help him get the fuel tanks to move certain aircraft.  Anthony did not report the request to management.  It was a Saturday, and the hangar was closed that day.  Anthony gave the keys to Berens to enter the Security Aviation hangar and then went home.  Berens left the keys in Anthony's tool box when he was ready to leave the hangar.

Assuming the mistaken belief by Agent Campe that Anthony had authority to allow them into the hangar, the question arises whether the validity of this consent should be determined upon the apparent authority of Anthony as it reasonably appeared to Agent Campe at the time the consent was given and the

search made, or should it be determined only on the basis of the subsequently ascertained actual authority.

In Illinois v. Rodriguez, 497 U.S. 177 (1990), the Supreme Court adopted the apparent authority doctrine. It its opinion, the Court explained:

> . . . that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government–whether the magistrate issuing a warrant, the police officer executing the warrant, or the police officer conducting a search or seizure under one of the exception to the warrant requirement–is not that they always be correct, but that they always be reasonable.

497 U.S. at 185-86. The upshot of this is that a search should not be undone by reasonable good faith mistakes of fact concerning the authority of the consenting party. Consent searches are merely subject to the Fourth Amendment's proscription on "unreasonable searches and seizures." Thus, a more subjective waiver of rights analysis is not appropriate. Law enforcement officers are entitled to proceed upon the basis of "factual and practical considerations of everyday life upon which reasonable and prudent men, not technicians, act." Brinegar v. United States, 338 U.S. 160 (1949).

In the instant case Agent Campe did not know what Anthony's (the consenting party's) actual authority was. Under the evidence adduced, the facts available to Agent Campe at the moment warranted a person exercising reasonable

caution in believing Anthony had authority over the hangar and that the entry into the hangar was based upon a lawful consent, not a trespass.  Agent Campe reasonably relied upon Anthony's response to the request of Berens as an invitation to enter the hangar.   The Fourth Amendment is designed to regulate police behavior. Suppression based upon an after-the-fact determination that there was not actual authority would have no deterrent effect since law officers can only act upon what reasonably appears to be correct at the time.   In essence, Security Aviation assumed the risk that their employee might permit a search of the hangar even though it might cost that employee his job.  Security Aviation management may have had a subjective expectation of privacy, but under the totality of facts and circumstances that expectation was unreasonable under the law.

Security Aviation's argument that the consent was made under the false pretense of gaining access to the hangar to search for the rocket pod/launchers fails because the consent was also obtained for the "legitimate, independent, motivation" of repossessing the batteries and fuel tanks.   There is simply no merit to its argument on the consent issue.  The search of the hangar by Berens and Campe was valid.   Thus, the court finds no merit in Security Aviation's argument that portions of the Campe affidavit to the search warrants should be stricken or that there was no probable cause for the warrant under the poisoned fruit doctrine.

## Application of the Plain View Doctrine

Riding in tandem with the foregoing is the application of the plain view doctrine. There are two sub-parts of the plain view doctrine. One, where there has been a valid prior intrusion, and the other where there has been no search but something is otherwise observed through the physical senses. *Id.* at 3.2(b). The case *sub judice* is concerned with the former. After the valid intrusion into the hangar, Berens and Campe observed the alleged rocket pod/launchers. They were immediately apparent and required nothing but to be seen. *Id.* Of particular importance here is the Supreme Court's teaching that the discovery of evidence in plain view need not be inadvertent. <u>Horton v. California</u>, 496 U.S. 128, 137-42 (1990). The search was conducted in concert with the "legitimate, independent, motivation" of the repossession, and as expected, the alleged rocket pod/launchers were seen in the same area as items sought to be possessed. There was no violation of the Fourth Amendment.

## Conclusion

For the foregoing reasons, it is hereby recommended that Security Aviation's motion to suppress evidence at docket entry 71 be denied.

DATED this 3rd day of May, 2006, at Anchorage, Alaska.

/s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge

3-06-cr-00022-JWS-JDR KANE @71 RR Re Mtn to Suppress.wpd

17

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **4:00 p.m.,  Friday, May 5, 2006**, to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.  <u>McCall v. Andrus</u>, 628 F.2d 1185, 1187-1189 (9th Cir.), <u>cert</u>. <u>denied</u>, 450 U.S. 996 (1981).  The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation <u>United States v. Howell</u>, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before **NOON, Tuesday, May 9, 2006**.   The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.  <u>See</u> <u>Hilliard v. Kincheloe</u>, 796 F.2d 308 (9th Cir. 1986).