# FAX TRANSMISSION

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUILDING U.S. COURTHOUSE, 222 W. 7th AVE., RM. C-253
ANCHORAGE, ALASKA 99513-7567
(907) 271-5071 [MAIN]
Fax: (907) 271-3224

**To:** Kevin T. Fitzgerald, Esq.
Fax: (907) 258-8751

**Date:** April 7, 2006

Paul Stockler, Esq.
Fax: (907) 272-4877

Robert C. Bundy
Allen Clendaniel
Fax: (907) 276-4152

**Pages:** 23 ~~16~~ (including cover)

**From:** Chrissy Sherman for JAMES BARKELEY

**Subject:** U.S. v. Kane & Security Aviation

**COMMENTS:**

I have attached a discovery numbers PODS000000348-PODS000000367.. Please sign date the appropriate receipt for your client and **return it via fax to (907) 271-1500.**

## NOTICE TO RECIPIENT

The information contained in this facsimile is intended only for the individual or organization named above and may contain sensitive or privileged information. If you are not the intended recipient, any dissemination or reproduction of this communication is prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for the return of all documents transmitted

EXHIBIT A
Page 1 of 14

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  04/01/2006

JAMES WESLEY MENDENHALL, a.k.a. JIM MENDENHALL, White, Male, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, was interviewed at the United States Attorney's Office, Federal Building and U.S. Courthouse, Anchorage, Alaska. MENDENHALL was accompanied by his attorney, JOHN MURTAGH. Conducting the interview were Special Agent (SA) Matthew P. Campe and SA Holly J. Steeves. Also present during the interview was Assistant U.S. Attorney (AUSA) Steve Skrocki. The purpose of the interview was a proffer session for MENDENHALL regarding the purchase of two (2) rocket launcher pods by MENDENHALL on behalf of ROBERT KANE and SECURITY AVIATION, INC. AUSA Skrocki explained the conditions of the proffer to MENDENHALL and provided him with a letter stating the conditions. MENDENHALL and MURTAGH signed the letter agreeing to the conditions of the interview. MENDENHALL was advised of the interviewers' identities and the purpose of the interview. MENDENHALL then related the following information during two (2) interview sessions on 03/14/2006 and 03/15/2006:

MENDENHALL is employed as the Director of Business Development for SECURITY AVIATION, INC. (SAI), in Anchorage, Alaska. MENDENHALL was hired by SAI in July of 2004. MENDENHALL worked twenty to thirty (20-30) hours each week and earned $40 an hour with no benefits. MENDENHALL had known former SAI owner JOHN O'NEAL and had helped O'NEAL get some jobs for SAI. O'NEAL later passed away, and MARK AVERY purchased SAI from O'NEAL's estate in 2005. Under O'NEAL, SAI's aircraft fleet consisted of two (2) Navajos, two (2) Conquests, and one (1) Citation jet. AT the time of AVERY's purchase of SAI, MENDENHALL believes the company was worth a maximum of only $4-5 million. MENDENHALL did not know the exact purchase price of SAI by AVERY. MENDENHALL provided the opinion that if AVERY purchased SAI for $8 Million, that would be a "ridiculous" amount.

MENDENHALL's role in the company after AVERY acquired SAI included attempting to secure U.S. Government contracts and calculating the operating costs of aircraft. AVERY had big plans for SAI, including acquiring U.S. State Department contracts.

Investigation on   03/14-15/2006 at  Anchorage, Alaska

File # 272D-AN-14342
SA Matthew P. Campe:mpc
SA Holly J. Steeves                           Date dictated  n/a

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency.

EXHIBIT  A
Page  2  of  14

PODS 348

272D-AN-14342

Continuation of FD-302 of __JAMES W. MENDENHALL_____ , On __03/14/2006__ , Page __2__

    JOE KAPPER was the president of SAI under AVERY, but he did not have much real power. ROBERT KANE was actually the individual who was in charge at SAI. MENDENHALL did not know KANE's official title or exact job description, but KANE was definitely "calling the shots" at SAI over KAPPER. MENDENHALL met KANE at the old hanger in approximately July of 2005 after the business was sold to AVERY, when KAPPER called out approximately ten (10) employees to introduce them to AVERY, KANE, and DENNIS HOPPER. KANE advised that SAI "will be flying for the Government, don't be surprised if GEORGE TENET shows up". HOPPER advised that "guns are mandatory". KANE advised that he had been shot twice, and HOPPER had been shot three (3) times. KANE claimed to have been wounded in the feet and back. MENDENHALL viewed these comments as very bizarre. MENDENHALL questioned the behavior of KANE during a meeting with PAT GAMBLE, a retire four (4) star General who works for the railroad, who counseled MENDENHALL that there are lots of government contractors out there who act like they are in a professional football locker room before a game. AVERY and KANE gave the impression that they were affiliated with the U.S. Government and were engaged in "Black Ops" by wearing 511 clothing, hiring numerous new employees with military backgrounds, creating an extensive security system at SAI, and forcing SAI employees to sign a huge non-disclosure agreement, purportedly due to "client confidentiality".

    KANE and AVERY were very close. KANE bought AVERY a vintage WWII P-51 Mustang fighter plane for AVERY's birthday in 2005. In response, AVERY bought KANE a vintage WWII F-4U Corsair fighter plane for KANE's birthday in October 2005. These aircraft reportedly cost over $1,000,000 each.

    KANE told MENDENHALL a number of strange statements. KANE claimed to have been working in Afghanistan after 09/11/2001. KANE claimed to have lived in France for three (3) years. KANE claimed to have worked for the CIA, FBI, NSA and other U.S. Government agencies, which he could do simultaneously due to "Memos of Agreement". KANE told a story about getting intentionally run off a road with STEPHEN FORTUNE in the vehicle. KANE had a tattoo on his shoulder which stated "SOG ASSASSIN".

    After SAI moved to their new hanger on the south ramp of the Ted Stevens Anchorage International Airport, KANE talked

EXHIBIT __A__
Page __3__ of __14__

PODS 349

272D-AN-14342

Continuation of FD-302 of ___JAMES W. MENDENHALL_____, On _03/14/2006_, Page __3__

about his big plans for the company. KANE wanted SAI to perform evacuation of U.S. State Department personnel. MIKE FARRELL visited KANE at SAI, and used an SAI Conquest to go fishing. MENDENHALL used Google to research FARRELL on the internet and determined that FARRELL is a prominent Washington DC attorney. By the Fall of 2005, SAI was negotiating a joint venture with DON KIRLIN, who employed famous Top Gun pilot CHARLIE HILL, to perform government contracts with the military. SAI was also attempting to get the AEROMED and ALASKA REGIONAL HOSPITAL aircraft contracts.

KANE had the power to purchase aircraft for SAI, and did so often. For example, in August of 2005, KANE advised MENDENHALL that he had located a helicopter for SAI for $325,000 and told MENDENHALL to buy it. MENDENHALL purchased the helicopter as instructed by KANE. One day later, MENDENHALL heard that SAI was purchasing two (2) Czech L-39 jet military aircraft. DONALD "DOC" HUDSON told MENDENHALL he had proposed purchasing an aerobatic airplane for inverted flight training. Later, SAI bought two (2) L-39s from DON KIRLIN or RAPTOR AVIATION. There was talk around SAI that they would be doing military contracts, and KANE and AVERY spoke about military training projects. In the third week of August 2005, MENDENHALL contacted JOE GRIFFITH to work for SAI. KANE and possibly AVERY recruited GRIFFITH, and hired him as a consultant for $70 per hour for the L-39 program. KANE continued purchasing more and more L-39 military aircraft with no known pre-buy inspection. KANE was paying full price for the L-39s; $250,000 to $300,000 each for the C and ZA models, and $800,000 each for the MS models from KIRLIN. KANE also wanted external fuel tanks for every L-39. CRAIG WOLTER indicated that he would like to take the L-39s to air shows. GRIFFITH indicated to MENDENHALL that L-39 aircraft had been demilitarized per the Treaty of Paris which requires that the fire control units and other military components be removed from the aircraft. GRIFFITH said there were notations in the L-39 logbooks indicating their demilitarized status. GRIFFITH brought in a book about tactical training to SAI.

During the Fall of 2005, KANE directed MENDENHALL to purchase patches for the SAI L-39 program. As MENDENHALL researched patches on the internet, he accidentally found the eBay ad of ALLEN SMITH offering rocket launcher pods described as "Zunis". MENDENHALL showed the eBay ad to GRIFFITH, who advised that these were actually not Zuni rocket launchers,

EXHIBIT __4__
Page __4__ of __14__

PODS 350

272D-AN-14342

Continuation of FD-302 of ___JAMES W. MENDENHALL_____, On _03/14/2006_, Page ___4___

which have a bore of five (5) inches. MENDENHALL then showed the eBay ad to KANE in KAPPER's office. KANE, KAPPER and CRAIG WOLTER were present. KANE, WOLTER and GRIFFITH discussed how cool the rocket launcher pods would look hanging on an L-39. KANE told MENDENHALL, "Let's get them." MENDENHALL advised KANE that he would do more research to determine exactly what they were. As a result, MENDENHALL did numerous searches on the internet to identify the launchers, and found a Wikopedia site with details on the UB-16x57mm rocket launcher pod. MENDENHALL continued to do internet research on the UB-16x57mm rocket launcher pod on his computers at work and at home, and he found photographs and specifications of various Soviet 57mm rockets. MENDENHALL claimed to have done this research on his own and was not directed by anyone to do so. MENDENHALL showed his research to SAI L-39 mechanic JOHN BERENS and asked how the pods attached to the aircraft. MENDENHALL also recontacted ALLEN SMITH via e-mail, and learned that MENDENHALL had four (4) UB-16x57mm rocket launcher pods for sale for $2,890 each, as well as four (4) external fuel tanks for the L-39 aircraft for $1,790 each. MENDENHALL showed this research to KANE, including the photographs of the 57mm rockets, as well as the proposed deal from SMITH to sell the four (4) rocket pods and fuel tanks. In response, KANE verbally authorized MENDENHALL to purchase these items, including the four (4) rocket pods. SMITH negotiated a price of $10,500 plus a deposit. SMITH agreed to take a deposit for two (2) rocket launcher pods to be delivered at a later date. KANE verbally authorized the purchase to SAI employee DALE WATSON, and WATSON electronically wired the SAI funds to SMITH.

When MENDENHALL questioned the description of the rocket launcher pods in the eBay ad, SMITH said the locking rings and other parts had been removed and the rocket launcher pods had been "demilled". SMITH had a pair of modified rocket launcher pod with dummy rockets, but MENDENHALL did not want these modified pods. SMITH agreed ship two (2) rocket launcher pods, and take a deposit on the second pair of pods to be delivered at a later date. During the interview, MENDENHALL referred to several printed e-mail messages between himself and SMITH regarding the purchase of these items which MENDENHALL had brought to provide to the Government. (MENDENHALL was confronted by the interviewers with an e-mail in the possession of the Government dated 09/20/2005 from SMITH to MENDENHALL in which SMITH states that the rocket launcher pods are "in good shape without damage and complete of all parts, less rockets."

EXHIBIT **A**
Page **5** of **14**

PODS0000**351**

272D-AN-14342

Continuation of FD-302 of __JAMES W. MENDENHALL__, On __03/14/2006__, Page __5__

The e-mail continued to discuss the rockets used in the UB-16x57mm launchers. This e-mail had been forwarded to KANE on September 21, 2005. MENDENHALL could not explain why he had not provided a complete set of e-mail messages to the Government, and agreed to provide a complete set through his attorney at a later date. MENDENHALL did provide two (2) pages of color photographs he obtained on the internet, including a photograph entitled "57mm Rockets stored at Maiman airfield", which were subsequently placed in a 1A Envelope.) MENDENHALL insisted to the interviewers that he relied on the original eBay ad of SMITH stating theat the rocket launcher pods were "demilled". MENDENHALL advised that he has no independent knowledge of what would need to be done to a military rocket launcher for it to be considered "demilled" or demilitarized and legal to own. MENDENHALL insisted that as far as he knew, the rocket launcher pods were intended by SAI for "static display" only. KANE never asked MENDENHALL about parts or rockets for the pods.

SMITH shipped the two (2) UB-16x57mm rocket launcher pods to MENDENHALL at the SAI hanger at the Ted Stevens Anchorage International Airport. The pods had not arrived in time to be displayed on L-39 aircraft as planned at the 10/08/2005 "Chili Feed" event at the SAI hanger. On 10/10/2005, the rocket launcher pods arrived at SAI via a DANZA air shipment. MENDENHALL, GRIFFITH, and an SAI ramp worker opened the crates containing the rocket launcher pods. KANE walked out and looked at the pods, and indicated that he thought they were cool, although MENDENHALL does not recall KANE's exact words. There were lots of comments made by the SAI employees standing around, and one rocket launcher pod was removed from the crate and the tail cone was installed. An unknown person in the group may have made the comment about using the rocket launcher pods for "target practice". The pods were then moved inside the hanger and stored in the main hanger bay. MENDENHALL is not aware of any attempt by SAI to hide the rocket launcher pods from FAA personnel. MENDENHALL knows that other SAI employees viewed the pods, as well as DENNIS HOPPER, and MENDENHALL's nephew. The rocket launcher pods were subsequently moved to the SAI Palmer hanger with the rest of the L-39 program in late October or early November of 2005. On 11/08/2005, a German L-39 mechanic, BERND REHN, witnessed the rocket launcher pods at the SAI Palmer hanger, and identified them as the old style of rocket launcher pods, and advised that SAI cannot use them.

EXHIBIT __A__
Page __6__ of __14__

PODS 352

FD-302a (Rev. 10-6-95)

272D-AN-14342

Continuation of FD-302 of __JAMES W. MENDENHALL__ , On _03/14/2006_ , Page __6__

    The interviewer's showed MENDENHALL three patch designs found in his SAI office during a Government search warrant. MENDENHALL explained that around 09/30/2005, KANE wanted custom patches for SAI, so MENDENHALL produced prototype patches depicting a shield showing an L-39 military jet over the Pacific region of the globe with the words "KANE'S KILLERS" inscribed on the bottom, as well as the same design with the word "ARGONAUTS" on the bottom. MENDENHALL claimed that he came up with these designs on his own, and they did not have any sinister meaning. MENDENHALL claimed that these patches and an accompanying printout defining an "Argonaut" as "a person who is engaged in a dangerous but rewarding quest; an adventurer" did not indicate that SAI was planning to engage in overseas military activity or mercenary activity. (Copies of these documents were placed in a 1A Envelope.)

    AVERY and KANE purchased numerous aircraft, including planes from DOUG GILLILAND and the AMERICAN AIR NETWORK. GILLILAND's company WORLD AIR owned and operated the aircraft that served AEROMED. SAI and KANE had some sort of "dirt" on GILLILAND and there was some sort of falling out, so KANE pushed him out of the business. KANE and AVERY had the plan to take over the air ambulance market in Alaska. The company FS AIR ceased to exist. KANE and AVERY were associated with PREMIER AIR in Nevada, which was flying Westwind jets from Nevada to Alaska to do charter flights in Alaska, which MENDENHALL stated did not make any business sense.

    During KANE's control of SAI, MENDENHALL became frustrated that SAI did not have a viable business plan. MENDENHALL was concerned about the rapid growth of the company and the enormous amount of spending under KANE. MENDENHALL was trying to improve the company by proposing to KAPPER the purchase of a computerized flight booking system, which was purchased in September or October, 2005. MENDENHALL calculated the costs of operating a Citation jet for medevac contracts, and determined that SAI would have to charge Regional Hospital double the cost of what FS AIR would charge, but he could justify the cost to REGIONAL HOSPITAL by breaking the costs down. MENDENHALL put together a three (3) page business plan for SAI, but KANE would not pay attention. MENDENHALL believes that KANE either did not care about the small details of operating a business due to the great potential business gain resulting from large government contracts, or KANE simply had no idea of how to run a business. In fact, both AVERY and KANE

EXHIBIT __A__
Page __2__ of __14__

PADS 353

FD-302a (Rev. 10-6-95)

272D-AN-14342

Continuation of FD-302 of __JAMES W. MENDENHALL__ , On _03/14/2006_ , Page __7__

seemed to know nothing about what they were doing in the aviation business. By December of 2005, SAI was "hemorrhaging" money. KANE was getting concerned about money at SAI. DAVE BEAN was hired by SAI to provide "adult supervision" for the company. SAI bookkeeper DALE HANSEN told MENDENHALL that SAI kept getting infusions of money from AVERY's other businesses to keep operating. CONNIE ELSWORTH was AVERY's bookkeeper who provided the large wire transfers to keep SAI going financially. ELSWORTH had worked with AVERY previously at the city prosecutor's office. MENDENHALL also contacted ROGER CHAN at VECO to try to obtain more business for SAI.

MENDENHALL advised that all of the new aircraft acquired by KANE and AVERY, with the exception of one (1) Conquest aircraft, were not needed by SAI and had no legitimate business purpose. The Gulfstream executive jets were losing a huge amount of money. A simple three (3) hour non-revenue flight in a Gulfstream cost SAI a fortune. MENDENHALL calculated that a Gulfstream jet required 480 hours of revenue flight each year to simply break even financially. Every hour on the ground cost SAI money, while non-revenue flights were hugely expensive. However, the two (2) SAI Gulfstream jets made only a handful of flights, including a non-revenue proving flight over the pole to Scotland. Other SAI Gulfstream flights included: A trip to London to visit Lloyds of London; a revenue Singapore trip; a Russia trip; a trip to the Bahamas with JOHN COLLINS on board; and, a trip to Orlando, Florida for the NBAA trade show. The fourth floor of the Troy Hanger was established as the dedicated Gulfstream office which was restricted to most SAI personnel. The Gulfstream pilots were hired for $120,000 each year and were constantly getting training, but they were not flying enough revenue flights to earn money for the company.

MENDENHALL advised that the SAI could potentially make $5 million on a single military government contract, but acknowledged that such contracts were only unsolicited proposals to the government by SAI. The only contract solicited by the government was a $1 million target towing contract with the U.S. Air Force (USAF), which SAI did not receive. TOM CASE, a former 3 star General had provided the opinion that there was a market for private fighter opposition, or "aggressor", contracts for the USAF. MENDENHALL does not know if any private company is actually doing aggressor training for the USAF, and acknowledged that the USAF is activating its own aggressor training squadron. KIRLIN was known to be using his L-39 for government contracts

EXHIBIT **A**
Page __8__ of __14__

PODS 354

FD-302a (Rev. 10-6-95)

272D-AN-14342

Continuation of FD-302 of ___JAMES W. MENDENHALL___ , On _03/14/2006_ , Page __8__

at Cold Lake, Canada. MENDENHALL believes that aircraft classified as "experimental" by the FAA can be used for "public use" such a government contracts. MENDENHALL advised that SAI had no contracts for the L-39 aircraft, only speculation about possible contracts. KANE claimed that he was buying so many L-39 jets so he could buy out the competition. Someone at SAI also mentioned that NORAD was looking for a Soviet Bear bomber to test their radar defense systems.

In the Fall of 2005, KANE came up with the concept of using the L-39 military jet aircraft to provide military aircraft and training to the Philippine military. KANE advised that the Philippines has a need for such services, although he did not explain the source of his knowledge for such a need. MENDENHALL knew that KANE's wife was a Filipino, and her uncle or father may have visited SAI and received an L-39 ride from GRIFFITH. MENDENHALL heard that a relative of KANE's wife was a "bigwig" in the Philippines government. KANE tasked MENDENHALL and GRIFFITH with writing a training proposal for the Philippines military. They also created similar SAI training proposals for the United Nations and the USAF. GRIFFITH wrote the concept paper, while MENDENHALL put togther the PowerPoint presentation. The proposal included the possibility that the L-39 aircraft would be shipped to the Philippines and leased to the government, or simply left there as part of the contract. MENDENHALL sent the Philippines and United Nations proposals to attorney MIKE FARRELL. When SAI ran into problems with the FAA and the SAI L-39 fleet was grounded, KANE claimed that he had called personally to the White House to get help with the FAA.

MENDENHALL questioned the source of AVERY and KANE's money when he saw the extremely rapid growth of SAI during 2005. KANE had told MENDENHALL that KANE's "partner" had $500 million. MENDENHALL had heard rumors at SAI that the source of the money was a trust fund. MENDENHALL learned from his own internet research that AVERY was in fact a trustee for a large private trust, so he assumed that this was the source of the money for SAI. MARK AVERY's brother, MATT AVERY, told MENDENHALL that SAI received an influx of money because it was a "startup". Representatives HAWKER and BERKOWITZ personally vouched for AVERY. KANE advised MENDENHALL that they have only three (3) investors that they (SAI) have to satisfy. MENDENHALL believed the three (3) investors were the trustees. In August or September of 2005, trustee JOHN COLLINS, JR. came to Alaska to visit SAI. MENDENHALL learned from JASON WARD that COLLINS was

EXHIBIT __A__
Page __9__ of __14__

PODS 355

FD-302a (Rev. 10-6-95)

272D-AN-14342

Continuation of FD-302 of __JAMES W. MENDENHALL__ , On _03/14/2006_ , Page __9__

one of the trustees. COLLINS took a flight trip in an SAI Conquest to Nome, Alaska. COLLINS reluctantly acknowledged to MENDENHALL that he was involved with a trust, but advised that he was friends with AVERY and KANE. Later, in September or October of 2005, COLLINS drove his mobile home from California to Alaska. COLLINS received a tour of SAI, and COLLINS or his wife took a ride in an SAI L-39 jet with an unknown SAI pilot. TOM TROTTER, SMITHERMAN, GRIFFITH and CRAIG WOLTER were the qualified L-39 pilots at that time.

BERND REHN of the German company AERO-CONTACT supplied a large amount of L-39 parts to SAI in late 2005. These parts had been ordered by SAI mechanic BERENS, but SAI management later questioned whether BERENS had the authority to make this purchase. REHN had delivered the parts to SAI, but was not being paid by SAI. GRIFFITH and MENDENHALL agreed that REHN should be paid for the parts and REHN was told that "someone was working on it". KANE was confused about this situation and thought that REHN had already been paid, so he refused to pay REHN.

EXHIBIT __A__
Page __10__ of __14__

PODS 356



**U.S. Department of Justice**

United States Attorney
District of Alaska

---

Federal Building & U.S. Courthouse
222 West 7th Avenue, #9, Room 253
Anchorage, Alaska 99513-7567

Commercial: (907) 271-5071
Fax Number: (907) 271-1500

March 30, 2006

**HAND DELIVERED**

Robert C. Bundy
Allen Glendaniel
Dorsey & Whitney, LLP
1031 West 4th Avenue, Suite 600
Anchorage, Alaska 99501

Re:  <u>United States v. Security Aviation</u>
     3:06-cr-022-JWS

Dear Mr. Bundy,

We have copied discovery in this case consisting of pages number PODS000000178-PODS000000228 & a CD labeled F-4u Corsair Photos and Video from Kane's laptop.

Please provide our office with 1 replacement CD-R at your earliest convenience.

Very truly yours,
DEBORAH M. SMITH
Acting United States Attorney

*Chrissy Sherman*
CHRISSY SHERMAN
Legal Assistant for
STEVEN E. SKROCKI
Assistant U.S. Attorney

RECEIVED BY: _____  DATE _____

EXHIBIT A
Page 11 of 14

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  02/21/2006

ALLEN H. SMITH, III, 2625 Church Road, Glenside, Pennsylvania (PA), telephone number (215)887-0826, and cellular telephone number (610)202-4855, was interviewed at the Ft. Washington Office of the FBI. Also present during the interview were two attorneys representing SMITH and his company, ASTRADYNE, Inc., Glenside, PA. JOSEPH M. LAMONACA, Esquire, 127 Commons Court, Chadds Ford, PA, telephone number (610)558-3376, and cellular telephone number (302)388-2621, is an attorney specializing in Aviation Law. DUANE D. WERB, Esquire, 300 Delaware Avenue, Suite 1300, Wilmington, Delaware, telephone number (302)652-1100, and cellular telephone number (302)218-6486, is a practicing criminal attorney.

For identification, SMITH provided a valid Pennsylvania Driver's License, PA OLN 13590813. Both SMITH and attorney LAMONICA were served a Federal Grand Jury(FGJ) subpoena directed to SMITH requiring his appearance on Tuesday, February 21, 2006, before a FGJ, Anchorage, Alaska, with specified records and documents. LAMONICA was advised to contact the federal prosecutor in this matter for further instructions and travel arrangements.

By way of background, ALLEN H. SMITH, III, is a divorced W/M, DOB 12/17/1948, SOC 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, residing by himself at 2625 Church Road, Glenside, PA. Since January 2005, SMITH has been employed as an Executive Director, Technical Services Division, TENGION, (a pharmaceutical biotech company), 2200 Renaissance Blvd., Suite 150, King of Prussia, PA, telephone number (610)292-8364, ext 110. SMITH is also president and sole operator of ASTRADYNE, Inc., Glenside, PA, telephone number (215)887-6289. SMITH developed ASTRADYNE in 1992 as a hobby/business highlighting flight instruction, air show performances, aircraft repair/restoration, and sales of fabric patches, pilot supplies, check hats, and aviator memorabilia.

SMITH owns two aircraft, a Beachcraft T-34, and an Aero L-39 military fighter jet. Both aircraft are housed in two hangers leased by Smith at Northeast Philadelphia Airport, Philadelphia, PA. He manages an eBay website store, Aviation Warbirds USA, with approximately 450 items for sale, including

| | | |
|---|---|---|
| Investigation on | 02/17/2006 | at Ft. Washington, PA |
| File # 272D-AN-14342-302 | | Date dictated 02/21/2006 |
| SA John V. Schaefer | | |
| by SA Daniel E. O'Donnell | | |

EXHIBIT A
Page 12 of 14

FD-302a (Rev. 10-6-95)

272D-AN-14342

Continuation of FD-302 of __Allen H. Smith__ , On _02/17/2006_ , Page __2__

two de-militarized ZUNI rocket launcher pods designed to fit the L-39 jet fighter.

SMITH was asked a series of questions relating to his acquisition of military rocket launcher pods, and the sale of two 16-tube pods to Security Aviation, Anchorage, Alaska. SMITH expressed his willingness to cooperate in this matter. SMITH became familiar with Security Aviation in September 2005. His only point of contact at Security Aviation was JIM MENDENHALL, who purchased fabric L-39 patches from SMITH as advertised on eBay. Sometime during the middle of September 2005, MENDENHALL purchased and paid SMITH for the patches. After receiving the patches from SMITH, MENDENHALL inquired if SMITH had anything else for sale associated with the L-39. SMITH responded he had external fuel drop tanks and referred MENDENHALL to his website, noting there were other items listed.

In addition to the patches, SMITH sold MENDENHALL four drop tanks, and two ZUNI rocket launcher pods. They were in negotiations for the sale of two additional pods, but that sale never materialized. SMITH will supply his documentation for the sales to MENDENHALL. MENDENHALL was the only person SMITH dealt with at Security Aviation. SMITH was of the opinion Security Aviation had government contracts for testing civilian and military domestic defense systems. MENDENHALL seemed more knowledgeable than SMITH about the pods stating they were UB-16 rocket pods, rather than what SMITH referred to as ZUNI rocket pods.

SMITH purchased the pods for $1500 each, as is, in 1997 or 1998, from a dealer, DAVID CANNAVO, Delaware Supply, Wilmington, Delaware. SMITH characterized the pods as strictly ornamental as they were de-militarize, meaning the locking rings, squibs, and all electronic components had been removed. SMITH purchased the pods from CANNAVO in good faith that they were declared and cleared through U.S. Customs when CANNAVO brought them into the United States. Smith has no paperwork showing the pods were de-militarized. He believes CANNAVO should have the appropriate documentation.

SMITH arranged for crating to transport the drop tanks and rocket pods. Security Aviation made arrangements for ground shipment from Pennsylvania to Alaska. MENDENHALL used DANZA International Freight Hauler for ground transport by truck in three days. They were not shipped by FedEx or DHL. SMITH

EXHIBIT __4__
Page __13__ of __14__

FD-302a (Rev. 10-6-95)

272D-AN-14342

Continuation of FD-302 of __Allen H. Smith_____ , On _02/17/2006_ , Page __3__

received a down payment of $5000 for the four drop tanks and two pods. The drop tanks were approximately $1800 each. The pods were approximately $2800 each. Security Aviation was billed by SMITH for constructing the crates for shipment. All payments were by wire transfer directly into SMITH'S Wachovia Bank account. SMITH and attorney LAMONICA provided copies of photographs he had taken of the pods in various stages of crating prior to their shipment to Alaska.

SMITH in unaware of any specific licensing or permits required to sell these pods. SMITH has not sold rocket launcher pods to any other buyers. These two were listed for sale on SMITH'S eBay store website for more than two years, advertised as authentic, de-militarized, and in excellent condition. SMITH'S understanding of their intended use at Security Aviation was primarily decorative. SMITH kept two additional pods he purchased from CANNAVO in his hanger at Northeast Philadelphia Airport. These two pods were his personal property, also de-militarized, in perfect condition, and not for sale. SMITH made red dummy rockets for placement into the tubes that were essentially for show.

Prior to this interview, SMITH and his attorney's were aware of a federal investigation involving Security Aviation after reading articles published in the Anchorage Daily News. After learning the nature of the investigation involved federal firearms charges to include illegal possession of two 16 tube rocket launchers capable of being fitted to an L-39 military jet aircraft, SMITH closed his website and had ZUNI rocket pods removed from his eBay web store.

On February 14, 2006, SMITH removed the two remaining launcher pods from his hanger at the Northeast Philadelphia Airport and returned them to CANNAVO in Delaware to be destroyed. SMITH did not witness their destruction. He assumes CANNAVO destroyed any pods he possessed as well. SMITH offered no explanation of why he destroyed his personal pods if he legitimately believed they were legal to possess and/or sell.

EXHIBIT _A_
Page _14_ of _14_

PODS000000223