DEBORAH M. SMITH
Acting United States Attorney

STEVEN E. SKROCKI
JAMES N. BARKELEY
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:06-cr-022-JWS |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S TRIAL** |
| vs. | ) | **MEMORANDUM** |
| | ) | |
| ROBERT F. KANE, | ) | |
| a/k/a "COMMANDER KANE," and | ) | |
| SECURITY AVIATION, INC., | ) | |
| | ) | |
| Defendants. | | |

## I.        INTRODUCTION

Defendant Security Aviation and Robert F. Kane are charged with

Conspiracy to Possess Unregistered Destructive Devices, Possession, Attempted

Possession, and Transportation of an unregistered explosive device in violation of

18 U.S.C. § 371, and Title 26 U.S.C. § 5861(d). Trial is set to commence on

Monday, May 15, 2006.  The United States estimates that its case-in-chief should

conclude within three trial days.

## II.         STATEMENT OF THE CASE

### A.  Case Summary

This case concerns the acquisition of two UB16-57U rocket pod

launchers by employees of Security Aviation that could be mounted on L-39

military jet aircraft.  At the time of the indictment Security Aviation and/or its

wholly owned subsidiary, Regional Protective Services, LLC. (RPS) owned

outright 8 L-39 aircraft and were attempting to purchase an additional 4 more L-39

aircraft or its variant.

The rocket pods at issue in this case carry the designation "UB16-

57U".  The designation "16" signifies that the pods can carry for firing 16 S-5

rockets.  The designation "57" stands for "57mm", or, 2.25 inches, the diameter of

the S-5 rocket.  All told, a typically configured L-39 aircraft could carry 32 S-5

rockets apiece.

With regard to these pods, the defendants are charged with the

purchase, interstate transportation, receipt and possession of two UB-57-16 rocket

pod launchers by Security Aviation through and at the direction of Robert F. Kane

in October, 2005. Since that time, and up until February, 2006, the rocket pods were in the possession of Security Aviation, Inc. Two complete rocket pods were shipped and delivered to Security Aviation from outside the state of Alaska, two other rocket pods, already paid for, were to be delivered to Security Aviation per the agreement between Security Aviation and the seller. None of the rocket pods at issue in this case were registered as required with the Bureau of Alcohol, Tobacco and Firearms National Firearms Registration and Transfer Record. (NFRTR)

The government's burden of proof at trial is relatively straightforward. As argued herein, the government must show that the rocket pods were not registered in the NFRTR and that defendants knowingly possessed the rocket pods, and knew of the features that brought the pods within the scope of the statute. Additionally, the government must show that the defendant conspired with others to possess the pods under the general conspiracy statute. Finally, the government must prove the interstate transportation of the pods.

### B. Statement of Facts

At trial, the government will prove that in September, 2005 a Security Aviation employee located on eBay an advertisement from Allen H. Smith (a Pennsylvania resident) indicating that Smith had for sale two UB-16-57U rocket pods which would fit the Aero Vodochody L-39 military jet aircraft. The evidence

will show that an employee of Security Aviation located the rocket pods for sale and informed Robert F. Kane (Kane) of their availability.  Evidence from several witnesses will show that Kane ordered this employee to purchase the pods.  The employee did so, using Security Aviation funds. Several weeks after the purchase, the pods arrived at Security Aviation's Ted Stevens Anchorage International Airport Hangar, 6121 South Airpark Drive located on the south end of Ted Stevens Anchorage International Airport.  During the interim between purchase and arrival, evidence will show that Kane and the company were kept appraised of the pods arrival and other issues via electronic mail between a Security Aviation employee and Kane.[1]

Upon arrival at the Security Aviation Hangar, the pods were viewed by many employees of Security Aviation, at least one of them will testify that Kane made various statements with regard to their use, including the phrase "now we can go do some serious target practice."  Another witness will state that Kane said "we can charge high rollers to sit in the backseat and shoot at barges in Prince William Sound."  Witnesses will also testify as to Kane's exuberance with regard to the

---

[1]The evidence will establish that Kane bragged about the financial resources at his disposal, and that Kane not only had the capacity to bind Security Aviation but also the nearly unfettered power to run the company.

pods arrival. In one instance he grabbed an employee from his office to show him the pods.

The evidence will show that the pods remained in the South Anchorage Hangar for some time until in October, 2005, Kane showed the pods to TSA Assistant Security Director for Law Enforcement, Wilbur Hooks and TSA counsel Bruce Roberts. Director Hooks, a 20 year veteran of the Anchorage Police Department, will testify that Kane showed one of the pods to both men (Hooks and Roberts) during a visit to the Security Aviation hanger. Hooks will testify that Kane took both men to a tarp located at one end of the hangar. Kane lifted the tarp to reveal what Hooks will describe as one of the rocket pod launchers. He will also testify that Kane said to him, "We can't let FAA know about this..." After this viewing, Hooks was sufficiently alarmed by the pod that he immediately informed the Joint Terrorism Task Force of the FBI about what Kane had shown him. Roberts, a friend of Mark Avery's, never informed law enforcement with regard to his observation and did not reveal it until interviewed by the FBI in February, 2006, after the execution of the search warrants against Security Aviation.

At some point that fall, the pods were moved from the Security Aviation South Anchorage Hangar to Palmer, Alaska. Witnesses will testify that the pods were moved by Security Aviation employees, using Security Aviation

equipment, to a hangar leased by Security Aviation in Palmer, Alaska where they remained with the L-39's in the Palmer Hangar, two of which have been examined by a government expert and have been found to be in "military configuration", i.e., could have been readily used as a firing platform for the pods. Until seized during the search of the hanger by the FBI in February, 2006.  Also found at the hangar L-39 manuals and rocket pod wiring,  mounting, and firing instruction.

During its case-in-chief, the government will also call an expert from the National Air and Space Information Center with regard to the rocket pods. This individual will testify as an expert in the field of Soviet-bloc aircraft ordinance.  He was made known to the defense in the government's motion to continue, filed with the court in February, 2006.  On April 12, 2006, this expert inspected the two rocket pod launchers seized during the course of the government searches and has determined them to be completely operational and in no way demilitarized nor are there any parts missing.  His report was prepared and was disclosed to the defense.  Further, the government made this expert available to the defense team for extended questioning on Friday, March 12, 2006 wherein both counsel for defendant Security Aviation and counsel for defendant Robert Kane (Mr. Paul Stockler) were permitted unrestricted access to this expert for questioning.   The government also permitted Mr. Evan Joe Griffith, a witness

called by Robert Kane at the preliminary hearing stage as an expert, to participate

and observe the questioning. The session lasted between an hour and a half to two

hours and was terminated by the defense. Accordingly, the defendants have been

provided with expert discovery in the form of notice of the inspection, the identity

of the inspector, his expert report as well as an early and complete opportunity to

interview and, in effect, cross-examine the expert prior to trial.

As to defendant Kane the government will be eliciting testimony from

several witnesses that Kane was the individual in charge of Security Aviation's

aircraft purchases, that Kane made the hiring and firing decisions at the company

and was, for all intents and purposes, was at least co-decision maker at Security

Aviation along with Mark Avery. As recently as today, May 8, 2006, Kane

personally fired a Security Aviation ramp employee while in the company of Mark

Avery, Ray Sleeth, and Dave Bean and others. Moreover, the evidence will show

that Mark Avery purchased Kane's home, in cash, for $711,000 for Kane's use,

and that all of his business and personal vehicles were provided to him through his

work with Mark Avery plus a $20,000 cash salary.

The evidence will also show that Kane was very familiar with

firearms, often carried them, and stored legal, but significant heavy weapons inside

the Avery and Associates law firm building on C Street. The government has

provided the defense with photographs of the searches of Kane's home, and his

two offices located at the C Street offices of Avery and Associates. These photos

and accompanying testimony will include evidence that one of Kane's offices held

a .50 caliber sniper rifle with tactical scope, and at least five AK-47-type assault

rifles along with a plethora of FN-Five-Seven handguns. The government will

also introduce evidence as to the other firearms contained within the offices of

Security Aviation including:

-The armory of Dennis Hopper. Hopper is a Class III federal firearm

licensee and was at the time of the search a consultant of Regional Protective

Services. Hopper maintained a gun room/armory within Avery and Associates

offices. In the gun room were various silenced and unsilenced sniper rifles with

tactical scopes, tactical shotguns, assault rifles, submachine guns and one belt-fed

machine gun, silencers, and other quasi-law enforcement/military weaponry.

Witnesses will testify that Kane personally showed them this room (the existence

of which is documented by the investigation and photographed) and that Kane

gained access to the gun room via his own key. One witness in particular will state

that Kane said all of the weaponry was necessary because, he stated words to the

effect of, "people here in Anchorage are going on a mission."

-The presence of fully automatic machine guns and belt-fed ammunition for these machine guns. At least two were found within the Avery and Associates building. These weapons were legally registered with the NFRTR. [2] One belt-fed machine gun was seized because it was not registered as belonging to Avery but was nevertheless in his possession.

- the presence of numerous other firearms, including tactical shotguns, high end pistols, military assault rifles and other armaments and the ammunition thereto found in various locales of the offices of Avery and Associates.

The government will also seek to introduce testimony from a witness concerning Robert Kane's actual use of heavy weapons. This witness will testify that he personally observed Kane fire a .50 caliber heavy machine gun and a rocket launcher in 2001 while Kane resided in Klamath Falls, Oregon.[3]

The government will also be introducing photographs of the weapons found during the course of the search of Kane's residence and vehicle, including combat style assault rifles and shotguns.

---

[2]The Government will call ATF program manager Gary Schaible, who will authenticate ATF firearm licensee records, pertaining to Hopper, registration records for Avery's machine guns, and non-registration records for the rocket pod launchers. He will also provide testimony, based upon his 30 years of experience at ATF, with regard to the regulatory framework controlling these records.

[3] The basis for the introduction of this evidence, and its evidentiary basis will be discussed below.

The government will be calling approximately 15 witnesses and will be introducing approximately 40 pieces of evidence.

### C. Summary of the Charges

As noted, the defendant is charged in the Indictment with the following offenses:

| COUNTS | OFFENSE CHARGED |
| --- | --- |
| 1 | Conspiracy to Possess Unregistered Destructive Device - Vio. of 18 U.S.C. 371 |
| 2 | Possession of Unregistered Destructive Device - Vio. of 26 U.S.C. §5861(d) |
| 3 | Unlawful Transportation of Destructive Devices- Vio. of 18 U.S.C. §§ 922(a)(4) and 924(a)(1)(B) |

### D. Witnesses

At trial, the government will call some or all of the following:

1. Some of the local and federal law enforcement officers who were involved in the investigation of this case or who were involved in the arrest of the defendant, the search of his residence and business offices;

2. Several former  mechanics and former employees of Security Aviation and worked for the L-39 program and were percipient witnesses to the events underlying the general allegations listed in the indictment.  Magistrate Judge

Roberts has previously heard much of this testimony during the evidentiary hearings;

3.  A weapons expert employed by the National Air and Space Information Center, U. S. Air Force, Wright-Patterson Air Force base, Dayton, Ohio who will testify as to the rocket pods being complete in all respects and operationally capable.

4.  An L-39 airframe and power plant mechanic conversant with the L-39 aircraft who will testify that his inspection of two of the L-39 aircraft are militarily configured with necessary electrical, mechanical and, in one case, the gunsight necessary for the rocket pods to be operated from those specific aircraft. He will also testify that he successfully mounted the seized rocket pod launchers onto the wing pylons of an L-39 military jet aircraft seized from Security Aviation. He will also provide testimony of his personal observations of de-militarized rocket pods and his own installation of de-militarized rocket pods on L-39 aircraft.

### E.  Exhibits

The government will offer some or all of the following exhibits at

trial:

1. The two UB16-57 rocket pod launchers, expert testimony, various

diagrams and photographs.  Given the size, weight and bulk of the rocket pod

launchers and the number of witnesses who will be testifying about them, the

government seeks leave from the court to have the pods remain in the courtroom

during the trial.

2. A witness from the BATF who will provide an opinion that the

rocket pods purchased by Security Aviation are destructive devices within the

meaning of 26 U.S.C. § 5845(f)(2).

3. A witness from BATF who will testify that he has access and

control to the records of the National Firearms Registration and Transfer Record

(NFRTR) and the rocket pods in question are not registered with the NFRTR.  This

witness will also testify as to the general statutory background with regard to the

National Firearms Act and other items requiring registration under the Act such as

bazookas, mortars, and other heavy weaponry.  This witness will also show

Hopper's federal firearms expertise by documenting Hopper's numerous ATF

Firearm Transaction Records; he will also testify to the registration of machine

guns found at Security Aviation's C Street offices.  Numerous certified records will be introduced.

4.  Emails, and other Security Aviation documents establishing Kane's managerial authority, purchasing authority, hiring and firing authority and operational authority, including emails and internet research concerning the purchase, transportation and payment for the rocket pods.

5.  An electronic, consensually monitored phone call wherein Kane states he has unlimited financial resources, i.e., "I have more money than God" and a video clip where Mark Avery personally presents Kane with a 2.4 million dollar F4U Corsair which further establishes Kane's financial dealings with Mark Avery, owner of Security Aviation.

6.     Schematic diagrams, bombing tables, rocket firing tables and other technical documents found during the search of the Palmer Hanger pertaining to the relationship, connection, maintenance and use of the rocket pod launchers and the Security Aviation/RPS owned L-39 airforce.

7. Photographs necessary to understand the lay and expert testimony of government witnesses concerning locations searched, evidence seized, at the C Street offices and armory room, the Palmer Hangar, and Security Aviation's squadron of L-39 aircraft.

## III.  LEGAL/EVIDENTIARY ISSUES

The following are issues that the government expects will arise during the course

of the trial:

### A.     Scienter Under Section 5861(d)

The mental element to be proved for a violation of 26 U.S.C. § 5861(d) was

delineated by the United States Supreme Court in *Rogers v. United States*, 522

U.S. 252 (1988).  In that case, a prosecution for possession of a silencer, the

Supreme Court extended the holding of *Staples v. United States*, 511 U.S. 600

wherein the court held given the long-standing legality of possession of firearms in

the United States it would not find that Congress intended to subject a citizen to

severe gun crime penalties for possessing automatic weapons which they honestly

and reasonably believed to be ordinary firearms.  *See, Staples*, 511 U.S. at 619 (for

conviction for unregistered machine gun government required to prove that

defendant knew of the characteristics of his firearm that brought it within the

statute) *Rogers* determined that *Staples* analysis covered not only machineguns but

other "firearms" within the meaning of the National Firearms Act.  As stated in

*Rogers*:

> [u]nder our decision in Staples v. United States, [] the mens rea element
>
> of a violation of § 5861(d) requires the Government to prove that the

defendant knew that the item he possessed had the characteristics that

brought it within the statutory definition of a firearm.  It is not, however,

necessary to prove that the defendant knew that his possession was

unlawful, or that the firearm was unregistered.

Id. at 254-55.

The government therefore proposes, as it has in its package of jury

instructions to the court, the following instruction be given:

1) The government must prove beyond a reasonable doubt that the

defendant had knowledge of the characteristics of the weapon that brought it within

the definition of a "firearm" under the Act.

2) Thus, the government must prove that the defendant knew the

firearm/destructive device will, or which may be readily converted to, expel a

projectile by the action of an explosive or other propellant, and having a barrel

width greater than half an inch.

As in any case, courts have held that knowledge can be proven by

circumstantial evidence.  In *United States v. Rith*, 164 F.3d 1323, 1337 (10th

Cir.1999), it was held that a jury could reasonably infer that the defendant knew

the barrel of a sawed-off shotgun was "observably shorter than the legal length"

along with the defendant testifying that shotgun was sawed-off.  In that case the

conviction was affirmed despite the defendant's testimony that he was unaware of the precise length of the barrel. Other cases have similarly found circumstantial evidence was used appropriately to establish knowledge. See *United States v. Morgan*, 216 F.3d 557, 567-68 (6th Cir.2000) (jury could infer defendant's knowledge that firearm with a selector switch was an automatic weapon from his experience in the Army and status as a "gun enthusiast."); *United States v. Mitchell*, 209 F.3d 319, 324-25 (4th Cir.2000) (defendant's fabrication of silencer permits inference he knew its purpose); *United States v. Gergen*, 172 F.3d 719, 725 (9th CIr.1999)(external appearance of weapon weighs heavily as to defendant's knowledge of the shotgun's dangerous characteristics); *United States v. Elliott*, 128 F.3d 671, 672 (8th Cir. 1997)(defendant's observation of the machine gun he possessed is circumstantial evidence of knowledge of its characteristics); *United States v. Moore*, 97 F.3d 561, 564 (D.C. Cir. 1996)(holding that jury could infer defendant knew that rifle was under the legal length by fact that he had observed the thirteen and a half inch barrel.

Although *Staples* and *Rogers* require the government to prove the defendant's knowledge of the features that brought the weapon within the scope of Section 5861(d) the law does not require that the government prove certain things that are most certainly going to be raised by defense counsel during the course of

the trial. The government will similarly be providing these rules to the court in its

jury instruction package and will also be filing a separate motion in limine with the

court for a ruling pretrial that these issues are irrelevant for the jury's

consideration.

It follows, then, that given the statutory framework and reasons behind

the regulation of dangerous firearms and instrumentalities of war that courts have

found that the defendant need not know the firearm in his possession had to be

registered under the Act. *See United States v. Owens*, 103 F.3d 953, 955 (11th Cir.

1997) *United States v. Mains*, 33 F.3d 1222, 1229 (10th Cir.1994) It is also the law

that the defendant's intended purpose of the destructive device is irrelevant.

*United States v. Dalpiaz*, 527 F.2d 548, 551 (6th Cir. 1975)(intended purpose to use

pipe bomb irrelevant) Nor does the government need to prove that the weapon

operate as intended.  *United States v. Langan*, 262 F.3d 615 (6th Cir.2001) The fact

that ammunition was not present is similarly irrelevant. *Cf., United States v.

Melancon*, 462 F.2d 82, 85 (9th Cir.1972) *see United States v. Freed*, 401 U.S. 601

(1971), *Melancon*, 462 F.2d at 96 (it was enough to prove that a Japanese knee

mortar was a firearm or destructive device under the terms of section 5861(d)

without regard to the existence of a projectile for use in it.)

Lastly, the government is not required to prove that the defendant possessed components of an unregistered destructive device with intent to use them as a weapon when the components themselves are clearly regulated by section 5861(d) as a destructive device.  *United States v. Urban*, 140 F.3d 229 (3rd Cir.), *cert. denied*, 525 U.S. 850 (1988)

In light of the jury instructions filed by the government contemporaneously with these motions it is clear that evidence of Kane's and Security Aviation's purchase of aircraft, other heavy weapons, firearms, and other quasi-military evidence will be of central import at trial.  The foregoing information therefore provides a specific framework of what the government need not prove, but what is, to the contrary, relevant and direct evidence of state of mind, intent and motive for the acquisition and purchase of the rocket pods.

**B.    Non-Registration via ATF Certifications**

As the court knows, one of elements required to be proven by the government is that the rocket pods in question were not registered by Kane or Security Aviation in the National Firearms Registration and Transfer Record. (NFRTR) The NFRTR is the central registry maintained by the Secretary of Treasury listing all firearms "in the United States which are not in the possession or control of the United States. 26 U.S.C. § 5841(a).  In this case, the United States

will offer the lack of registration for the rocket pods by an ATF certification stating that after a diligent search of its records no records relating to the registration of the rocket pods was located.

Evidence of non-registration by ATF certification is appropriate in cases charging conspiracy to possess unregistered firearms even if the defendant has never taken possession of the firearms. *See United States v. Sedigh*, 658 F.2d 1010 (5th Cir.1981) Additionally, such certificates fall within Fed.R.Evid. 803(10) as exceptions to the hearsay rule. Many courts have upheld the admissibility of the NFRTR certificates against hearsay, reliability, and confrontation clause challenges. *See United States v. Rith*, 164 F.3d 1323. 1334 (10th Cir. 1999), United States v. Hale, 978 F.2d 1016, 1020-21 (8th Cir.1992); *United States v. Combs*, 762 F.2d 1343, 1347-48 (9th Cir. 1985); *United States v. Beason*, 690 F.2d 439, 443-45 (5th Cir.1982); *United States v. Harris*, 551 F.2d 621, 622 (5th Cir.1977; *United States v. Cruz*, 492 F.2d 217, 220 (2d Cir.1974)

Under Federal Rule of Evidence 902 it is sufficient if the ATF certification is accompanied by a document under seal, and executed by an appropriate ATF official, stating that the certifying official had proper custody and control of the NFRTR and that the signature of the certifying official appeared genuine. Accordingly, the ATF NFRTR records are self-authenticating and appropriate

exceptions to the hearsay rule for admittance into evidence at trial.  Nevertheless, the ATF program manager will also testify as to the authenticity of these records and will explain the statutory framework requiring registration of certain firearms, including destructive devices.

**C.**     **Stipulations**

The parties continue to discuss possible evidentiary stipulations.  No stipulations have been concluded to date.

**D.**     **Expert Witness Testimony**

**1.**     **General Standards**

Expert opinions are admissible if they will assist the trier of fact to understand the evidence or determine a fact in evidence.  Rule 702, Fed. R. Evid. Expert opinions, as opposed to testimony by summary witnesses, may be based on facts or data not admissible into evidence.  Rule 703, Fed. R. Evid.

An expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact.  Fed. R. Evid. 704.  The court has broad discretion to determine whether to admit expert testimony.  *United States v. Anderson*, 813 F.2d 1450, 1458 (9th Cir. 1987);  *United States v. Binder*, 769 F.2d 595, 601 (9th Cir. 1985).

**2.**     **The Expert Testimony to be Offered at Trial**

The government intends to call several experts at trial and have provided notice to the defense of these experts. The government has also provided to the defense the reports of the experts and, in the instance of Charlie Watson, provided the defense the unusual and early opportunity to interview Mr. Watson during the week of February 12, 2006, more than a month before the trial date. During that interview, counsel for defendant Robert F. Kane, Paul Stockler, his assistant, Robert Bundy, counsel for defendant Security Aviation, and Evan "Joe" Griffith, a consultant employed by Security Aviation were given the opportunity to question Mr. Watson at length concerning his findings. The interview was over two hours in duration and was terminated once defense counsel indicated they had no further questions for Mr. Watson.

The government expects Mr. Watson's testimony to state that he found the two UB16-57U rocket pod launchers found during the search of the Security Aviation hangar located in Palmer, Alaska, to be in "pristine condition." Mr. Watson, a former air force officer is employed as a civilian contractor with the United States Air Force at Wright-Patterson Air Force Base, Dayton, Ohio and operates under the auspices of the National Air and Space Information Center. His occupation for the last ten years has been to analyze for the United States military every manner of air to ground munitions, ordinance, rockets, missiles, and bombs

of any foreign power which could be used against the United States Military

including their delivery systems.  Mr. Watson is intimately familiar with the UB16-

57U rocket pod launcher and the S-5 rockets which are designed to fit into the

UB16-57U.

Mr. Watson will testify that in his opinion the rocket launchers possessed

by Security Aviation and ordered by Robert Kane were completely intact and fully

functional. Moreover, he will testify that he performed an electrical connectivity

test on both pods which indicated that they possessed the electrical wiring/circuitry

necessary for firing S-5 rockets.  Mr. Watson will opine that the two pods are fully

functional and intact with no missing pieces nor components.  By definition, then,

the rocket pods will be established to be destructive devices that were not

registered in NFRTR.  Both of these elements, as shown above, are necessary for

the government to prove that a violation of 26 U.S.C. 5851(d) occurred.[4]

Additionally, the government will be calling ATF firearms examiner Earl

Griffith.  Mr. Griffith will testify that in his opinion the two rocket pods, which he

examined, are fully functional and not missing any component parts.  Given that

finding, Mr. Griffith will state his opinion as a firearms examiner that the two

---

[4] Watson's opinion is that the S-5 rockets themselves and related accessories for holding the loaded rockets in place, constitute ammunition for the fully-operational ready-to-load rocket launcher pods.  Mr. Watson will discuss a rocket loading in the presence of the jury.

rocket pods fall within the definition of "destructive devices" and, accordingly, were required to be registered with ATF.  Mr. Griffith, who has extensive experience in the field of firearms and inspection of them under the National Firearms Act, will also testify that he performed an electrical connectivity test and like Mr. Watson found the pods completely functional with no missing pieces. Accordingly, he will opine that given their intact nature they are thus classified as "destructive devices" and should have therefore been registered under the NFRTR.

The government will also be calling Mr. Minh Venator, an L-39 expert with regard to the two L-39 aircraft that are in military configuration. (N394ZA, and N1205W) Mr. Venator will testify that with little effort, and in a short amount of time, these two aircraft would be fully capable of launching rockets from the two rocket pods.  He will testify that the necessary pylons, wiring, navigation, and weapons wire-harnesses are intact.  In the case of N394ZA, Mr. Venator connected the rocket pods to the aircraft and brought the aircrafts HUD (Head's up display) online. He will testify as to this procedure from photographs taken during the examination.  Finally, he will state that these two aircraft (and five others he examined belonging to Security Aviation) still possessed "pulse generators" in place which should have been removed as part of the demilitarization process

recommended by the Aero-Vodochody factory.  The pulse generators permit the pilot to select the number of rockets to be fired in a volley.

### E.      404(b) Evidence And Other Evidence of Intent, Motive, State of Mind

As of this writing, the government intends to introduce in its case in chief under Fed.R.Evid. 404(b) evidence the testimony of Mr. Eddie Wilchur.  Mr. Wilchur will testify that in 2001, when Kane was living in Klamath Falls, Oregon he (Wilchur) observed Kane fire a .50 caliber machine gun into an empty field, and, thereafter, observed Kane shoot a rocket from a rocket launcher into another field.  Wilchur's report of interview and the government's intention to call Wilchur has been provided to the defense.  The general principles with regard to admission of Fed.R.Evid. 404(b) provides as follows:

### F. Admissibility of Prior Act Evidence Under Fed.R.Evid. 404(b):

This evidence clearly admissible under Rule 404(b) of the federal Rules of Evidence.

Rule 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The Ninth Circuit has uniformly recognized that Rule 404(b) is one of **inclusion** and that other acts evidence "is admissible whenever relevant to an issue other than the defendant's criminal propensity." United States v. Chea, 231 F.3d 531, 534 (9th Cir. 2000). [emphasis added].  Prior bad acts evidence is thus admissible "except where it tends to prove only criminal disposition."  United States v. Rocha, 553 F.2d 615, 616 (9th Cir. 1977).  Accord United States v. Ayers, 924 F.2d 1468, 1472 (9th Cir. 1991); Heath v. Cast, 813 F.2d 254, 259 (9th Cir. 1987); United States v. Herrell, 588 F.2d 711, 714 (9th Cir. 1978); United States v. Sangrey, 586 F.2d 1312, 1314 (9th Cir. 1978); United States v. Riggins, 539 F.2d 682, 683 (9th Cir. 1976).  Rule 404(b) thus bars the introduction of evidence concerning prior criminal conduct or other bad acts by the defendant only if offered for the purpose of proving the defendant's bad character and implying that he acted in accordance with that bad character in the instant case.

The defendant's knowledge and intent in this case are material issues at trial "simply because the government has to prove  them."  United States v. Mayans, 17 F.3d 1174, 1182 (9th Cir. 1993).  "To establish a drug conspiracy, the government must prove:  (1) an agreement to accomplish an illegal objective; and (2) the intent to commit the underlying offense." United States v. Iriarte-Ortega, 113 F.3d 1022, 1024 (9th Cir. 1997), cert.denied, 523 U.S. 1012, 118 S.Ct. 1209, 140 L.Ed. 2d 330 (1998).

Further, "knowledge of the objective of the conspiracy is an essential element of the conspiracy conviction." <u>United States v. Krasovich</u>, 819 F.2d 253, 255 (9th Cir. 1987).

***This evidence is, in fact, material to every issue identified in Rule 404(b) including the issues of knowledge and intent, both of which are elements of the crime which the defendant is charged with.***

Nor is this the probative value of this evidence substantially outweighed by the danger of unfair prejudice as Rule 403 requires. Unfair prejudice means that the evidence "provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." <u>United States v. Bailleaux</u>, 685 F.2d 1105, 1111 (9th Cir. 1982).

Evidence is not unfairly prejudicial simply because it tends to convince the jury of the defendant's guilt; it is only when the evidence moves the jury on a basis unrelated to the merits of the case that it is prejudicial. In determining the probative value of the evidence, the Court must consider not only the logical inferences that the evidence will support, but also the actual "need for evidence of prior criminal conduct to prove a particular point." Id. at 1112. The Court must then balance the probative value against the danger of unfair prejudice, but can exclude the evidence only when

the latter substantially outweighs the former.  <u>United States v. Yazzie</u>, 59 F.3d 807, 810 (9th Cir. 1995); <u>Bailleaux</u>, 685 F.2d at 1111- 12.  Here, the evidence offered by the government of Kane's prior use of a rocket launcher will not "inflame" the jury to the point that it would substantially outweigh the probative value as Fed. R. Evid. 403 requires.

### G.  <u>Other Evidence Establishing Intent Regarding Kane and Security Aviation</u>

Rule 403, Fed. R. Evid., provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  <u>See also</u>, <u>United States v. Brannon</u>, 616 F.2d 413, (9th Cir. 1980), <u>cert. denied</u>, 447 U.S. 908.  The trial court has broad discretion in determining admissibility under Rule 403.  <u>United States v. Moore</u>, 552 F.2d 1068, 1079 (9th Cir. 1975), <u>cert. denied</u>, 423 U.S. 1049 (1976)

The government will introduce evidence relevant to Security Aviation's corporate state of mind as well as that of Robert Kane's through the following exhibits and testimony:

-Evidence obtained from Security Aviation/Avery & Associates Law Office, 3230 C. Street

a) Robert Kane's Office

-a .50 caliber sniper rifle and scope

-over a dozen FN-Five Seven pistols and ammunition.

-Satellite phone communication

-5 AK-47-style semi-automatic rifles stacked against the wall

b) In the remainder of the Security Aviation/Avery & Associates office space:

-Several fully automatic machine guns and belted ammunition.  It is the government's intention to offer these weapons as evidence of Security Aviation's and Robert Kane's knowledge of federal firearms laws, as well as evidence of the company having significant and more than enthusiast association with firearms.

- Several tactical shotguns with assault-style rifles found during the search of Kane's company vehicle and in his residence.

None of these items of evidence are "bad act" evidence but are more properly characterized as relevant and direct evidence of intent, motive, and state of mind and are thus admissible under Fed.R.Evid. 401.

**H.    Limits of Relevant Defenses**

An area of common exclusion involves attempts to confuse the issues or mislead the jury by introducing evidence of matters that do not establish a defense to the charged crimes.  See, United States v. Tidwell, 559 F.2d 262, 266-7 (5th Cir.

1977), cert. denied, 435 U.S. 942 (excluding evidence that defendant's manipulation of bank funds was beneficial to bank on grounds of danger of confusion of issues and misleading jury where belief in benefit to bank was not a defense to misapplication of funds); United States v. Johnson, 558 F.2d 744, 746-47 (5th Cir. 1977), cert. denied, 434 U.S. 1065 (excluding evidence of purported overpayment of taxes in fraudulent tax return prosecution on grounds of confusion of issues and improper appeal to emotions of jury).

In addition, although the Ninth Circuit has long recognized that juries have the power to acquit a defendant regardless of the evidence of his guilt, (see, United States v. Simpson, 460 F.2d 515, 518-19 (9th Cir. 1972)), it has never recognized a right held by a defendant to seek such a verdict. United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1991). The same follows for nullification since a defendant has no right to seek nullification, he has no right to present evidence relevant only to such a defense. See, Zal v. Steppe, 968 F.2d 924, 930 (9th Cir.), Trott, J., concurring, cert. denied, 113 S.Ct. 656 (1992).

While the defendant obviously has a right to present relevant defenses to the charges, he has no right to seek jury nullification and thus no right to introduce evidence which would be relevant only to nullification. This includes any reference to the potential penalties which the defendant faces as a result of conviction or which

individuals were charged with crimes and which were not charged due to either a continuing investigation or as a result of prosecutorial discretion. As the court is well aware, this is an area where trial juries are routinely instructed they are not to concern themselves with. The defendant may attempt to introduce evidence or make argument concerning the potential penalties he faces in this case, including the nature of the charges (felony offenses). This should be excluded as irrelevant to the jury's mission here - to be the finders of fact.

In this particular instance, the government will be requesting by motion in limine that the defense be prevented from questioning or arguing the age, model or version of the rocket pods at issue, the lack or availability of ammunition either within the United States or abroad, and other arguments directed at nullification. This would also include arguments on the lack of charges made by the United States against other individuals involved with Security Aviation and the purchase, shipment and possession of the two rocket pods at issue in this case.

Limits on Cross-Examination

At the evidentiary hearing on Security Aviation's motion to suppress the search of the Palmer Hanger counsel for the defense cross-examined two witnesses who were involved in the repossession of four L-39 aircraft, Robert Anthony and John Berens. During cross-examination of these witnesses, counsel for the defense asked

whether these witnesses felt "responsible" or felt "remorse" for the death of Stephan

Freeman, the L-39 pilot who crashed and was killed during an attempted landing in

Ketchikan, Alaska in late January, 2006.

As to Mr. Beren's, counsel for defendant Kane asked the following

questions:

Mr. STOCKLER: Are you concerned at all in your role in Mr. Freeman's

death?

WITNESS: No.

Mr. STOCKLER: Well, he'd still be alive today if you didn't go recover the

drop tanks, correct?

The question was objected to by the government on relevancy grounds and

sustained by the magistrate judge.

Docket 154, Page 38 (Transcript of Evidentiary Hearing)

As to Mr. Anthony, counsel for defendant Kane did the exact same thing,

attempting to elicit from Anthony whether he felt responsibility or remorse for Mr.

Freeman's death.

It goes without saying that this line of questioning is utterly irrelevant to the

trial and can serve no useful purpose other than to sully the witness.  Moreover,

attempting to have the witness accept blame for the death of Mr. Freeman, or not, is

just plain improper for a number of obvious reasons. First and foremost, it is a transparent attempt on the part of Security Aviation at eliciting evidence under oath for later use in a possible civil litigation brought by Mr. Freeman's estate via a wrongful death suit. It is just as transparent an attempt to rattle the witness with this line of questionning while at the same time focusing the juries attention on a matter not at issue in the case-the repossessing of the four Albatross aircraft in the context of a civil dispute. This line of questioning should not permit Security Aviation or Robert Kane to re-litigate the evidentiary hearing nor use this forum as a discovery tool to obtain and or mine a witness in anticpation of later litigation.

## I.    Defendant's Admissions and Co-Conspirator Statements

Under Fed.R.Evid. 801(d)(2) statements by Robert Kane are non-hearsay. During the course of the government's case it will be offering testimony by a number of witnesses  with regard to Robert Kane's statements including coconspirator statement between him and others.

Additionally, the government will be offering co-conspirator statements by others involved in the purchase, sale, and shipment of two of the rocket pods. The essential elements necessary to establish a conspiracy are: (1) an agreement by two or more persons to accomplish an illegal objective, coupled with (2) one or more overt

acts in furtherance of the illegal purpose. *United States v. Bailey*, 607 F.2d 237, 243 (9th Cir.), *cert. denied, sub nom. Whitney v. United States*, 445 U.S. 934 (1980).

Coordinated activity can raise a reasonable inference of a joint plan, *United States v. Smith*, 924 F.2d 889, 894 (9th Cir. 1991), and a conspiracy may involve sub-groups or sub-agreements. *United States v. Patterson*, 819 F.2d 1495, 1502 (9th Cir. 1987).

One may join a conspiracy already formed and in existence and be bound by all that has gone on before in the conspiracy even if unknown to him. *United States v. Bibbero*, 749 F.2d 581, 588 (9th Cir. 1984). A participant in a conspiracy is culpable if he joins a conspiracy knowing of its illegal purpose, and that his benefits depend on the success of the entire venture. *United States v. Arbelaez*, 719 F.2d 1453, 1458-1459 (9th Cir.) *cert. denied sub nom. Ponce de Leon v. United States*, 104 S. Ct. 3543 (1984).

Participation is deemed to be "knowingly" if the defendant knew or should have know of the conspiracy, *Arbelaez*, 719 F.2d at 1459, or if the defendant has maintained deliberate ignorance. *United States v. Nicholson*, 677 F.2d 706, 719 (7th Cir. 1982); *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976). The requirement of knowledge does not mean that the government must show the defendant knew all the details of the conspiracy or the identity or the role of all the

other conspirators to be culpable. *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978).

Once existence of a conspiracy has been established, only a slight connection to the conspiracy is necessary in order to convict any one defendant of knowing participation (emphasis added). *United States v. Stauffer*, 922 F.2d 508 (9th Cir. 1990); *United States v. Arevis*, 847 F.2d 1417, 1422-23 (9th Cir. 1988). The law of conspiracy does not distinguish between the relative degree of culpability of the defendants. *United States v. Marcello*, 731 F.2d 1354, 1360 (9th Cir. 1984). All members of a conspiracy are equally guilty.

### J. Admission of Co-conspirator Statements

Fed. R. Evid. 801(d)(2)(E) provides that a statement is not hearsay if the "statement is offered against a party and in furtherance of the conspiracy." Before a court will admit a statement of a co-conspirator into evidence and against a defendant, the government must establish by a preponderance of the evidence the three following requirements: (1) the existence of a conspiracy; (2) that the defendant and declarant were members of the conspiracy; and (3) that the statements were made during the course of and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 173 (1987) (emphasis added).

The trial court, in making the above preliminary factual determinations under Fed. R. Evid. 801(d)(2)(E), may consider, along with other evidence, the actual hearsay statements sought to be admitted.  Id. at 181; *United States v. Schmit*, 881 F.2d 608 (9th Cir. 1989).

Fed. R. Evid. 104(a) states that a judge is not bound by the rules of evidence when determining preliminary fact questions except with respect to privileges.  The judge may receive the hearsay evidence and give it "such weight as his judgment and experience counsel."  *Bourjaily*, 483 U.S. at 181.

The Court in Bourjaily found that the Confrontation Clause of the Sixth Amendment does not require the trial court to inquire into the circumstances of co-conspirator's statements to determine independent indicia of the reliability of the statements.  *Bourjaily*, 483 U.S. at 182.  The hearsay rules and the Confrontation Clause are designed to protect similar values.  Thus, if evidence falls within a hearsay exception, a court need not independently inquire into the reliability of such statements.  Id.

Finally, the decision as to whether the government has laid the proper foundation for the admission of co-conspirator statements lies with the judge rather than the jury.  *Id*. at 174; *United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979).  If the statement is admitted, the jury is to treat it as it does any other piece of evidence.

The trial court need not instruct the jury that it is only to consider the statement if it makes certain preliminary findings relative to the alleged conspiracy and the statements. *United States v. Ascarrunz*, 838 F.2d 759 (5th Cir. 1988).

The procedure for determining the admissibility of co-conspirators statements is left to the discretion of the trial court and *Bourjaily* does not alter this principle. *Bourjaily*, 107 S. Ct. at 2782; *United States Court v. Zemek*, 634 F.2d 1159, 1169 (9th Cir. 1980), *cert. denied, sub nom., Janovich v. United States*, 452 U.S. 905 (1981).

The court can allow the evidence of co-conspirators' statements subject to a motion to strike if the government's evidence does not ultimately satisfy the foundational requirements. *E.g., United States v. Watkins*, 600 F.2d 201, 204 (9th Cir.), *cert. denied*, 444 U.S. 871 (1979); *United States v. Zemek*, 634 F.2d at 1169. The Ninth Circuit has stated that it does not have a "preference" for the order of proof for admissibility of co-conspirator statements and leaves the order of proof to the discretion of the trial judge. *United States v. Zemek*, 634 F.2d at 1169; *United States v. Kenny*, 645 F.2d 1323, 1333-1334 (9th Cir.), cert. denied, 454 U.S. 828 (1981); *United States v. Perez,* 658 F.2d at 658, n. 2; *United States v. Long*, 706 F.2d 1044, 1053 (9th Cir. 1983) (defendant's request for a pretrial hearing properly denied).

Requiring a "mini-trial" on the admissibility of the evidence or even requiring the government to lay a complete foundation prior to admitting the co-conspirator's statements would frustrate justice and be an inefficient use of this Court's time. As the commentary to Rule 104(c), Fed. R. Evid., noted regarding a preliminary hearing:

> The procedure is time consuming. Not infrequently the same evidence which is relevant to the issue of establishment of fulfillment of a condition precedent to admissibility is also relevant to weight or credibility, and time is saved by taking foundation proof in the presence of the jury.

Notes of the Advisory Committee on Proposed Rules, Pub L. 93-595, Section 1, 88 Stat. 1926 (1981).

The government must establish by a preponderance of the evidence that the co-conspirator's statement sought to be admitted was made "in furtherance" of the conspiracy. *Bourjaily*, 483 U.S. at 173. To meet the "in furtherance" requirement, the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy. The question is whether the declarant was speaking so as to pursue the conspiracy. *United States v. Yarbrough*, 852 F.2d 1522 (9th Cir. 1988). The statements must somehow assist the conspirators in achieving their objectives. *United States v. Layton*, 720 F.2d 548 (9th Cir. 1983).

The Ninth Circuit held in *United States v. Schmit*, 881 F.2d 608 (9th Cir. 1989), that to establish that a co-conspirator's statement was made "in furtherance" of the conspiracy, as required for admission, the government was not required to prove that the statements actually furthered the conspiracy in fact; the court found that it was enough if the declarant made the statement for that purpose. *Id.* at 612 (emphasis added). The statements are admissible even if they hinder the plot. United *States v. Reyes*, 798 F.2d 380, 383-84 (10th Cir. 1986). The tape that the government sought to admit consisted of lengthy and somewhat rambling statements about "what (the declarant) was gonna do" and "who's involved." *Id.* at 611. The defendant argued that the statements were not "in furtherance" of the conspiracy because the statements were only "casual admissions" of culpability and "idle chatter." *Id.* at 612. The court rejected this argument finding that the trial court could infer from the context and content of the statement that the declarant intended to use it to advance the common enterprise. *Id.*

## K.    Electronic Mail of Security Aviation Employees

At trial the government will seek to admit several electronic mail correspondences between Security Aviation employees, and the seller of the rocket pod, Allen Smith. Several of these emails were forwarded to Robert Kane and were found on his laptop computer which was located by seizing agents during a search of the vehicle on February 2, 2006.

Federal Rule of Evidence 801(d)(2)(D) provides a statemtn is not hearsay if it is offered against a party and is a "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The rule "requires the proffering party to lay a foundation to show that an otherwise excludable statement relates to a matter within the scope of the agent's employment." Sea-Land Service, Inc., v. Lozen International, LLC, 258 F.3d 808, 821 (9th Cir. 2002) (*citations omitted*) (Internal company email authored by employee of one carrier and forwarded to another carrier employee was admission of party opponent and thus not excludable as hearsay and appeared to concern matter within scope of employee's duties, was incorporated and adopted by second employee in message forwarded to another shipper).

## CONCLUSION

The government has provided the Court with its best estimate concerning the issues likely to arise regarding its duty of establishing proof beyond a reasonable doubt. The government reserves its ability to respond in limine to the defense briefs as appropriate and will most certainly be providing additional supplemental jury instructions as the facts of the trial warrant.

RESPECTFULLY SUBMITTED this 8th day of May, 2006 at Anchorage, Alaska

DEBORAH M. SMITH
Acting United States Attorney

s/ Steven. E. Skrocki
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3380
Fax: (907) 271-1500
E-mail: steven.skrocki@usdoj.gov

s/ James Barkeley
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3380
Fax: (907) 271-1500
E-mail: james.barkeley@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2006
a copy of the foregoing was served
fax on Robert Bundy,
Allen Clendaniel, Kevin Fitzgerald,
& Paul Sockler.

s/ Steven E. Skrocki